CONTINENTAL STEEL CORPORATION *v.* FITCH.

[No. 18,891. Filed October 11, 1956. Rehearing denied November 15, 1956. Transfer denied March 5, 1957.]

*Murray, Mannon, Fairchild & Stewart, James L. Murray,* and *Richard W. Guthrie,* of Indianapolis, for appellant.

*Donald J. Bolinger,* of Kokomo, for appellee.

ROYSE, J.—Appellant here seeks a review of an award of compensation by the Full Industrial Board for

an accidental injury suffered by appellee, which injury the Board found arose out of and in the course of his employment by appellant.

By proper assignment of error appellant contends there is no evidence of probative value to show appellee's disability was the result of the accident complained of; that its evidence was of such a conclusive character as to force a contrary conclusion; that there is no evidence in the record to support the finding and award that appellee suffered a permanent impairment of 3% of the man.

These contentions require a consideration of the evidence and the reasonable inferences that may be drawn therefrom which are most favorable to appellee.

Appellee has been employed by appellant since 1952. On April 25, 1955 he was working as a "matcher" on the 3 P.M. to 11 P.M. shift. He was engaged in opening "stickers", which are two sheets of iron that the "opener" cannot get open. The matcher uses a pair of tongs to open the sheets he has to fold and put in under a hammer and send back down the conveyor that runs into the furnace.

Because appellant contends appellee's testimony on direct and cross examination as to how the accident occurred is so conflicting that it has no probative value, we set out from the record his description of how the accident occurred:

| *Direct Examination* | *Cross Examination* |
| --- | --- |
| "Q. Get up there, Alvin, as you were approaching these stickers to open them, what were your movements? | "Q. You had your tongs ahold of the top sheet at the end? |
| | A. That is right. |
| A. I had a pair of tongs in my hands. I went over to get it. | Q. And you were pulling up? |
| | A. Right. |

*Direct Examination*—Contd.

Q. You leaned over forward?

A. That is right.

Q. And put your tong

A. On the top sheet and opened it up a little ways and put my foot

Q. You pulled it up a little ways and stuck your foot between the two sheets of iron?

A. That is correct. When I came up with the sheet to open it.

Q. You say 'When you came up' what do you mean?

A. I was down about like this and I came up.

Q. You had your tongs on the iron and you pulled up?

A. That is right.

Q. You pulled up? About knee level?

A. Right. When I went to step like that the iron stuck.

Q. Now you stepped forward with your left foot while you were pulling up?

A. That is right. When it stuck it pitched me for-forward over the iron.

*Cross Examination*—Contd.

Q. And all at once it stuck, is that right?

A. Yes.

Q. And did your tongs slip off of it when it stuck?

A. If it hadn't, I would not have been able to help myself. It had to slip off.

Q. They did?

A. Yes.

Q. That threw you backwards?

A. No sir, threw me forwards.

Q. You were pulling backwards?

A. No, I was pulling up.

Q. Were you lifting them up?

A. I was lifting one trying to

Q. And you had the tongs ahold of this one sheet and you were lifting it up like that?

A. I was pulling straight up on it, yes.

Q. And it stuck and your tong slipped off of it?

A. Yes.

Q. As you were lifting up?

A. Yes.

*Direct Examination*—Contd.

Q. At the time it struck were you in a forward motion?

A. That is right.

Q. All right, go ahead and tell what happened?

A. When I went forward naturally like anyone I tried to catch—I had a pair of tongs in my hand. When I went forward I had the tongs in my hand and they hit the floor. That held me off the floor. My feet were still behind me. I went forward over like that on the tongs. The tongs held me up off the floor. I put my back into a curve, you might say. And I had a sharp burning in my back.

Q. You were, in fact, lifting the top sheet?

A. That is correct.

Q. Until it stuck to the bottom sheet?

A. That is right.

Q. Was it this sticking of the top sheet on the bottom sheet that caused you to pitch forward?

A. That is right.

*Cross Examination*—Contd.

Q. Is that right?

A. Yes.

Q. Then you fell forward rather than backward?

A. Yes, I fell forward.

Q. And in front of you were these sheets of steel, is that right?

A. Well, when you open them you don't stand exactly in front. You stand at the corner. You get to open from the corner.

Q. You were not standing at the end of the sheet?

A. That is right.

Q. You mean at the corner. Is that right?

A. That is right.

Q. And your tongs slipped off as you were lifting up?

A. As I went to step forward is when it stuck. I went to step forward and that is what threw me forwards.

Q. You went to step forward as you were lifting this one up?

A. Yes.

Q. And your tongs slipped off?

A. Right.

*Direct Examination*—Contd.

Q. Did you land on those tongs gently or with force or how would you describe it?

A. I landed with force. I was falling."

*Cross Examination*—Contd.

Q. And you started to fall forward?

A. Yes.

Q. Then you put the end of your tongs where?

A. The way I was pulling they went with me. When I was pulling I did not exactly put them anywhere. The weight of me pulling and falling, they naturally went in front of me. I did not exactly put them anywhere but I caught them."

Appellee then finished that job. When he started to the water fountain he could hardly walk. At the advice of a fellow employee he went to the Company hospital. There he saw a nurse and told her he had hurt his back. She gave him heat treatment and gave him some pain pills. She told him to came back in the morning and see the doctor. He returned to his job but did it in a squatting position rather than by bending his back. When he got home he sat in a chair for five or ten minutes. When he went to get up "he couldn't get out of the chair and his wife helped him up". She had to take off his shoes and socks. The next morning he went back to the Company hospital and saw Dr. Lung. He told him how the injury occurred and the doctor prescribed heat treatments. The doctor told him to come back for heat treatments every morning, which he did. On April 26th he was able to work only two rounds. On the advice of the doctor he did not work after that date. He continued to take the heat treatments for about two weeks. During the time when he talked to Dr. Lung he told him he

"wasn't doing very good." He told him when he coughed or sneezed "it felt like I was going to tear in two". The doctor said it was lumbago and would take a while to heal. Finally, Dr. Lung suggested he consult his family physician.

He then consulted Dr. Swartz for X-rays who recommended Dr. Cattell, a bone specialist. About May 13th Dr. Cattell diagnosed the trouble as a fracture of the anterior lips of the lumbar vertebra 3, 4 and 5, commonly called a compression fracture or broken back. He estimated the injury had occurred within three weeks prior to the time he examined him. He ordered him placed in a special body cast until August 17th. His back at the time of trial bothered him, particularly at night. He was not able to sleep because of this condition.

Two fellow employees who were working with him the night of April 25th said that immediately prior to the accident he worked normally and made no complaint about his back. He told them he had hurt his back. They said as he walked toward the hospital he walked with his back straight and bent his knees. When he returned to finish his shift they said he squatted rather than bend his back as he had just previous to the accident. The record discloses that on March 16, 1955 he was injured when some sheets of iron hit his left leg and skinned the leg, taking the hide off down to his ankle.

There is a sharp conflict in the medical testimony of the physicians as to whether the accident described by appellee could have caused his injury.

Dr. Cattell testified that from his examination he was of the opinion the accident causing the injury occurred three weeks or less before the date he examined him May 13th; that it could have occurred on April 25th. In answer to a question as to whether the accident heretofore described could have caused appellee's injury, he said:

"I would answer this way—that there would be a possibility that it could cause this type of injury. I think that if I had to put a percentage on it that it might be say, three times that it would not and one that it would, something of that sort. Maybe 25% of the time it might cause an injury like this. I think most of the time that it probably would not cause an injury of this sort. In order to break your back, so to speak, you have to have your hips bent up to 90 degrees to a right angle then your back has to be forced beyond that."

He said in the history appellee gave him of the injury of March 16th, but did not refer to the April 25th accident, Dr. Cattell told him that the former injury could not have caused his present condition. Appellee said Dr. Cattell asked him if he had been struck and he told him of the accident of March 16th. He said at the time he gave the history to Dr. Cattell he told him of the injury to his back of April 25th. This conversation was in the hall; that he and another doctor there were very busy. Dr. Cattell said that at the time of the trial appellee had a 5% impairment of the man as a whole. In answer to a question if that impairment is likely to decrease, he said: "I cannot say what is going to happen sir. I think 5% is fair at the present time and I think there is a possibility it might decrease some."

Dr. Lung, the Company physician, said he was at the hospital about one hour a day and had a lot of examinations. He does not keep the records. He said appellee did not tell him of the injury with the tongs.

Dr. Halfast, who examined appellee at the hospital and saw him several times between May 13th and October 26th said appellee told him of the injury of March 16th but did not refer to the accident of April 25th. He said he was of the opinion the latter injury could not have caused his trouble.

It is disclosed by the record that appellee was insured under a group policy for injuries occurring outside of

the plant. The day after appellee was placed in a cast two representatives of appellant's safety department contacted him. When appellee asked them why he was not getting either his insurance or compensation, one of them replied:

"Well insurance don't pay because you reported you were hurt inside the plant. I told him I was and he said 'Insurance don't pay it'. I asked him about my compensation and he said, 'Well, compensation don't want to pay it because there was no report made out the day I came down there of the injury and he asked me why I did not report to my boss that I had a broken back and I made the statement to him, 'How am I going to report a broken back if your doctor is doctoring me for lumbago'. They was arguing back and forth who would pay it, whether insurance would or the compensation. There is insurance policy and compensation.

Q. Just go ahead and state the conversation?
A. I asked them two or three times, the last time I talked to them if they will report the truth, John Mahan said to me "Alvin, if you will just tell them you were up town and walking and stepped off a curb and you hurt your back the insurance will pay you and ask no questions.'

Q. Did he say how much?
A. He did not say. I did not ask him.

Q. Did you know how much they would pay?
A. No, I did not. I knew it was around $40.00 a week but I did not know how many weeks but I think it was around twenty-six. I looked at him and I said 'What are you trying to get me to say?' He said 'I did not mean it that way' and I said, 'That is what it sounded like to me' and I turned around and walked out and that is the last time I have been there'."

Significantly, neither of these employees were called to testify in reference to this matter.

Upon this state of facts appellant contends that appellee gave two completely divergent views of how the accident occurred and that under the first state of facts

he could not have received the injury from which he is suffering. It is also contended the evidence shows he did not tell the doctors of the April 25th injury until some time after the cast was removed. It further contends its evidence was of such a conclusive character as to force a contrary conclusion. Finally, it asserts the finding of the Board that appellee had a permanent partial impairment of the man is contrary to law, first, because it is more than was demanded in his application; second, there is not a scintilla of evidence to support the award.

In support of these contentions it relies, among others, on the following cases: *Milholland Sales etc. Co.* v. *Griffiths* (1931), 94 Ind. App. 62; 178 N. E. 458; *Mishawaka Rubber etc. Co.* v. *Walker et al.* (1949), 119 Ind. App. 309, 84 N. E. 2d 897; *American Steel Foundries* v. *Wilson* (1953), 123 Ind. App. 385, 111 N. E. 2d 476; *Prudential Insurance Co.* v. *Spears* (1954), 125 Ind. App. 21, 118 N. E. 2d 813; *Wilson* v. *Indiana Gas & Water Co.* (1955), 126 Ind. App. 302, 130 N. E. 2d 498; *Hirst* v. *Chevrolet Muncie Division, etc.* (1941), 110 Ind. App. 22, 33 N. E. 2d 773, 37 N. E. 2d 3; *Wright* v. *Peabody Coal Co.* (1948), 225 Ind. 679, 77 N. E. 2d 116; *Nash* v. *Meguschar* (1950), 228 Ind. 216, 91 N. E. 2d 361. An analysis of these cases discloses they do not support appellant's contentions.

In *Milholland Sales etc Co.* v. *Griffiths, supra,* appellee died from epilepsy. Appellee injured his toe. Several days later he had convulsions and died. In reversing an award for compensation this court said:

"In this case, there is no conflict in the evidence as to the cause of death; the testimony of the physicians is in no way controverted; no witness testified that the wound became affected by blood poisoning or that the injury in any way accelerated the disease, or in any way contributed to the condition that produced death. No causal connection is shown

by the evidence, and there is apparent truthful testimony, positive in character, that disproves the contention of appellee in this case."

In *Mishawaka Rubber etc. Co.* v. *Walker et al., supra,* appellee drowned while fishing during the lunch hour. This court held where the company did not sponsor or encourage recreation programs, including fishing on its premises, it is not liable under the compensation law.

In *American Steel Foundries* v. *Wilson, supra,* appellee filed no brief. We held there was no evidence of permanent partial impairment.

In *Prudential Insurance Co.* v. *Spears, supra,* we reversed an award granting compensation where a debit insurance collector left his route to make a personal purchase and was killed leaving the plant where the purchase was made.

In *Wilson* v. *Indiana Gas & Water Co., supra,* we refused to reverse an award denying compensation because of appellant's faulty narration of the facts regarding the alleged accident, his reversal of testimony about certain facts, his failure to report the alleged accident, and his continued work thereafter.

In *Hirst* v. *Chevrolet etc. supra,* this court, in reversing an award denying appellant compensation under the Indiana Workmen's Compensation Act, pointed out that all of the medical testimony was to the effect appellant was suffering from bronchitis which appellant said was caused by fumes and dust in the heat department of the plant. Appellee contended that the disease was the result of influenza. There was a dispute as to whether he told a doctor he had recently had the flu. This court held where there was no medical evidence that he had the flu, that even if he had made such statement it had no probative value.

In *Wright* v. *Peabody Coal Co., supra,* the Supreme Court reversed this court and affirmed the award of the

Industrial Board denying compensation because there was a conflict in the evidence as to how and when the injury complained of occurred.

In *Nash* v. *Meguschar, supra,* the Supreme Court, in reversing this court, held there was sufficient evidence to sustain the finding of the Board that appellant was an independent contractor.

Appellee contends his testimony of how and when the accident occurred, the corroborating evidence of his fellow employees, and the testimony of Dr. Cattell that such an accident could cause such an injury, is sufficient to sustain the award of the Board. He further says: "There is no inconsistency in plaintiff's testimony; in both accounts, plaintiff states that he was lifting the top sheet of steel when the two sheets stuck, and that he fell forward. It is not inconsistent as appellant contends, that these sheets stuck, that he did not mention in the first part of the evidence herein set out that his tongs slipped off the stuck sheet, as this was a natural and probable consequence of the two sheets sticking. He did testify in the first instance that when he fell forward, he caught himself with the tongs against the floor. This in itself would necessitate the tongs slipping off of the top sheet of steel when the two had stuck together". We agree.

Finally, he says his application at No. 14 was sufficient to claim not only temporary total disability benefits but also benefits for permanent partial disability. In support of his contention he relies on the following authorities: *Magazine* v. *Shull* (1945), 116 Ind. App. 79, 60 N. E. 2d 611 (Transfer denied) ; *Blackfoot Coal & Land Corporation* v. *Cooper* (1950), 121 Ind. App. 313, 95 N. E. 2d 639 (Transfer denied) ; *Indiana Power & Water Company* v. *Miller* (1920), 73 Ind. App. 521, 127 N. E. 837; *Kenwood Erection Company* v. *Cowsert* (1953), 124 Ind. App. 165, 115 N. E. 2d 507 (Disability

case) ; *Miers* v. *Standard Forgings Corporation* (1946), 117 Ind. App. 89, 69 N. E. 2d 180, Small's Workman's Compensation Law, §9.5, p. 246.

In the Blackfoot Coal case, *supra,* after reviewing and quoting with approval from the cases of *Bimel Spoke and Wheel Co.* v. *Loper* (1917), 65 Ind. App. 479, 117 N. E. 527, the Indiana Power & Water Company case, *supra,* and the Magazine case, *supra,* we pointed out that in this state we are definitely committed to the doctrine that where there is evidence of the type of Dr. Cattell's in this case and it is supported by other facts, conditions and circumstances which would support a reasonable inference that the claimant suffered an accidental injury, it was sufficient to sustain the award of compensation under our Act.

It is undisputed by the medical evidence that appellee suffered a broken back within three weeks of May 14, 1955. His testimony and that of his fellow employees, with Dr. Cattell's evidence, is sufficient to sustain the finding and award that he sustained an injury by accident arising out of and in the course of his employment, and that he was totally disabled from April 28, 1955 to October 21, 1955.

In our opinion there is no merit to appellant's contention that the award is contrary to law because, in answer to Question 14 in his application for compensation to the Board as to particulars of disability, whether total or partial, and estimated duration thereof, he answered total disability, about twelve weeks.

The uncontradicted evidence of Dr. Cattell that appellee, at the time of the hearing had a 5% impairment of the man as a whole and there was a possibility it might decrease some in the future, is sufficient to sustain the finding and award for compensation for 3% of the man.

This is one of those cases where, on the facts, the minds of reasonable men might well have differed in

the conclusion reached. Under such circumstances we may not disturb the finding and award of the Board.

Award affirmed, with usual penalty.

Kelley, J., not participating.

NOTE.—Reported in 137 N. E. 2d 450.