Shymanski, Appellant, vs. Industrial Commission
and others, Respondents.*

*November 9—December 7, 1956.*

* Motion for rehearing denied, without costs, on February 5, 1957.

308

For the appellant there was a brief by *N. Paley Phillips,* and oral argument by *Mr. Phillips* and by *Mr. Bertram J. Hoffman,* both of Milwaukee.

For the respondent Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

For the respondent Nekoosa-Edwards Paper Company there was oral argument by *J. E. Coleman* of Milwaukee.

Steinle, J.   The plaintiff Melvin Shymanski maintains that the Industrial Commission in its determination of disability, disregarded certain undisputed medical evidence of record upon the basis of which he was entitled to a finding and award for specific permanent partial disability in addition to that found and for which compensation was ordered. He seeks a remand of the cause to the commission for its determination of permanent partial disability involving postconcussional symptoms, which he claims exists and is not disputed of record, and for which no compensation was ordered. There is no challenge of the findings or of the awards for temporary disability or permanent partial disability of 19.89 per cent loss of vision of plaintiff's left eye.

Although considerable medical evidence was adduced at the hearings, the controversy centers on evidence involving opinions of three physicians who examined the plaintiff, viz., Dr. Joseph A. Mufson, neurosurgeon; Dr. Erwin E. Grossmann, ophthalmologist, and Dr. Mark J. Bach, an independent examiner appointed by the commission.

In direct examination Dr. Mufson testified that he examined the plaintiff on January 8, 1954; that from the history which indicated a fracture of the cheekbone immediately below the left eye, and unconsciousness for several minutes, he concluded that the plaintiff sustained a fairly severe injury; that at the time of the examination the plaintiff complained of

a number of symptoms, principally headaches, double vision, blurred vision when he was exposed to bright lights, sensitivity of the left nostril to cold air and nervousness; that in his opinion, due to these numerous postconcussional symptoms, the plaintiff was suffering permanent disability estimated to be about 10 per cent of the body as the whole; that said 10 per cent estimate excluded all items that an eye doctor would find relating to plaintiff's eye.

On cross-examination Dr. Mufson stated that the plaintiff exhibited double vision, had a tender depression of the floor of the orbit, and possessed the symptoms related in his direct examination; that the plaintiff appeared to be apprehensive and jumpy; that he could not conclude that such nervousness was a permanent condition; that excepting for such findings, the neurological status was within normal limits.

Dr. Grossmann testified in part as follows: His examination revealed a depression deformity of the left side of plaintiff's face, such as is seen after fractures of the orbital, malar, or zygomatic facial bones; central visual acuity and fields of vision were normal; muscle tests revealed a right hyperphoria in the primary position. Using the red-glass test, diplopia (double vision) was elicited in the right and upper meridians and most marked in the upper and left. The lateral muscle functions and not of much import, although fatigue symptoms may ensue. In answer to the specific question: "What about the ability to continue using his eyes, is that affected in any way? In other words, do his eyes tire?" the witness stated in part: "Well, each eye individually affected, individually considered normal. When they are used together, as we say, binocularly, the disturbance is, well, vary from time to time, there are symptoms of fatigue and headache, that we do see in these muscle injuries, and it varies with the position of the gaze. . . . the diplopial fields show a double vision to exist largely in the upper fields."

Dr. Bach's report, which was received in evidence, included certain questions and answers with respect to his examination of the plaintiff on August 27, 1954, that read as follows: *"Question.* Give an accurate and complete description of the nature and extent of disability (including subjective complaints, objective findings, and diagnosis). *Answer.* Complaints now of feeling of outward pulling of left eye, in attacks, and associated with severe headaches. Attacks, lasting from one to three days, occur from one to three-week intervals. Double vision on looking up and to the left. Cannot watch a show or television because of ocular discomfort. In addition, nerves are very 'jumpy' since the accident. Symptoms best relieved by covering the left eye. There is a palpable displacement of the left orbital rim resulting from fracture. Also scars at left side of nose, and left cheek near outer canthus of eyelids. There is two degrees of left hypophoria, and five degrees of exophoria in the primary position. There is diplopia in the left upper portion of the binocular visual field. *Question.* Will disability be total or partial? *Answer.* Partial since return to work. *Question.* If partial, what per cent? *Answer.* 3.4 per cent of motor-field efficiency. *Question.* What percentage of disability to the member or organ involved; or to the entire body if injury is to torso or head? *Answer.* 3.4 per cent of motor-field efficiency; additionally perhaps, because of headaches resulting from extraocular muscle imbalance. *Question.* What elements constitute disability (such as limitation of motion, deformity, weakness, pain, lack of endurance, etc.)? *Answer.* Diplopia, and extraocular muscle imbalance. *Question.* What improvement, if any, is anticipated? *Answer.* None, other than perhaps nervous symptoms." Under the heading of "Remarks," Dr. Bach stated:

. "The injury has not affected the visual acuity of the individual eyes themselves, but by reason of disturbance of the extraocular muscles of the left eye, from fracture of the orbital bones, muscle imbalance, with diplopia has resulted.

"The visual acuity of 20/24 plus for distance appears to be normal for this man. The near vision of 14/35 would appear to be distinctly abnormal, but when using both eyes, this man reads 14/21 with and without correction. I believe that each eye is actually capable of 14/21 vision for near, because this figure corresponds to the distance acuity of 20/24, and there is no impairment of accommodation. The essential visual disability in this case is the muscle imbalance, with diplopia in a portion of the binocular visual field."

Plaintiff contends that the disability involving nervousness and headaches as reflected in the evidence above outlined, is not included in the schedule of sec. 102.52 (16), Stats., employed by the commission, but that it falls within the category of permanent partial disability as provided in sec. 102.44 (3). Contra is the contention that the evidence of Dr. Grossmann and Dr. Bach indicates that all of the symptoms are traceable to the eye injury for which an award was ordered. It is maintained that the provisions of secs. 102.52 (16) and 102.55 apply.

Sec. 102.44 (3), Stats., provides in part:

"102.44 MAXIMUM LIMITATIONS. Section 102.43 shall be subject to the following limitations:

"(3) For permanent partial disability not covered by the provisions of sections 102.52 to 102.56 the aggregate number of weeks of indemnity shall bear such relation to the number of weeks set out in paragraphs (a) and (b) as the nature of the injury bears to one causing permanent total disability . . . not to exceed, however, these named limitations, to wit:

"(a) One thousand weeks for all persons fifty years of age or less."

Sec. 102.52 (16), Stats., provides:

"102.52 PERMANENT PARTIAL DISABILITY SCHEDULE. In cases included in the following schedule of permanent partial

disabilities indemnity shall be paid for the healing period, and in addition thereto, where the employee is fifty years of age or less, for the period specified, at the rate of 70 per cent of the average weekly earnings of the employee, to be computed as provided in section 102.11: . . .

"(16) *Total impairment of one eye for industrial use, 250 weeks.*" (Emphasis supplied.)

Sec. 102.55, Stats., provides in part:

"APPLICATION OF SCHEDULES. . . . (3) For all other injuries to the members of the body or its faculties which are specified in this schedule resulting in permanent disability, though the member be not actually severed or the faculty totally lost, compensation shall bear such relation to that named in this schedule as disabilities bear to the disabilities named in this schedule. Indemnity in such cases shall be determined by allowing weekly indemnity during the healing period resulting from the injury and the percentage of permanent disability resulting thereafter as found by the commission."

The medical evidence referred to above indicates that each of the physicians was of the opinion that the plaintiff suffers from diplopia (double vision), which is the result of extraocular muscle imbalance, the latter of which in turn is due to fracture of a facial bone. Manifestly, the injury to the facial bone is a head injury. There is no provision in secs. 102.52 to 102.56, Stats., for such type of injury, but the same is covered under sec. 102.44 (3). Dr. Mufson expressed a view that the plaintiff's headaches and nervousness are caused by the head injury, while the reports of Drs. Grossmann and Bach indicated that the headaches result from the extraocular muscle imbalance. From this evidence it appears that the headaches do not result from the double vision for which compensation was ordered, but that they are traceable to the impairment of the muscle outside the eye, which latter condition was caused by the injury to the facial bone. While the double vision and the headaches have their origin at the

same source, they are, nevertheless, separate and distinct injuries.

Dr. Mufson found that one of plaintiff's postconcussional symptoms was "jumpy nerves," but indicated that the nervous condition would not be permanent. The findings of Drs. Grossmann and Bach indicated no disability from nervousness. The absence of finding of such condition by the latter two doctors was a sufficient basis entitling the commission not to make a finding regarding it.

No allowance can be made in a compensation award for physical or mental suffering, however acute, which does not interfere with earning capacity. 2 Larson, Law of Workmen's Compensation, p. 137, sec. 65.20. While it appears that the headaches are postconcussional symptoms, there is no evidence of record indicating that they interfered with the plaintiff's earning capacity. Dr. Grossmann testified "that there are symptoms of fatigue and headache, that we do see in these muscle injuries" and Dr. Bach reported that as to permanent disability there is "3.4 per cent motor-field efficiency, additionally perhaps because of headaches resulting from extraocular muscle imbalance." The term "perhaps" connotes possibility rather than probability, and awards cannot be based on mere possibilities. *Molinaro v. Industrial Comm.* (1956), 273 Wis. 129, 133, 76 N. W. (2d) 547. While the commission was entitled to base its findings on evidence relating to the opinions of Drs. Grossmann and Bach, nevertheless, since the opinions of those physicians clearly indicate conjecture and uncertainty as to the extent or duration of the plaintiff's headaches, any finding of disability based thereon would have been of no legal effect. A finding of fact made by the commission cannot be based upon mere conjecture any more than a finding of fact by a court or jury. *Creamery Package Mfg. Co. v. Industrial Comm.* (1933), 211 Wis. 326, 331, 248 N. W. 140. As said in *Gallenberg v.*

*Industrial Comm.* (1955), 269 Wis. 40, 43, 68 N. W. (2d) 550. "The extent of disability, temporary and permanent, was a question of fact and the commission's finding thereon, if supported by any evidence, is conclusive."

The commission's findings and award must be sustained.

*By the Court.*—Judgment affirmed.

BROWN, J., took no part.