JOHNSTON, Appellant, vs. INDUSTRIAL COMMISSION and others, Respondents.

*January 10—February 4, 1958.*

■■■■■

For the appellant there was a brief and oral argument by *Frank L. Morrow* of Eau Claire.

For the respondent Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

For the respondents city of Eau Claire and Iowa National Mutual Insurance Company there was a brief by *Stafford, Pfiffner & Stafford* of Chippewa Falls, and oral argument by *Robert F. Pfiffner.*

STEINLE, J.   On December 4, 1953, the plaintiff, Charles Johnston, then forty-eight years of age, a sewer worker for the city of Eau Claire, who had been so employed for two and one-half years up to that time, was assisting a fellow workman in the cleaning of a city sewer. After the work inside the manhole was completed, Johnston straddled the manhole, bent his body forward, and with a pick attempted to pull the cover (which weighed about 100 to 150 pounds and was lying about two or three feet away) over the hole. The weather was at freezing temperature, the ground was slippery, and the cover would not move easily. His first attempt at so pulling the cover toward him, failed. When he again tried, his feet slipped from under him and he fell to a sitting position so that the portion of his body at the back of his hips was wedged inside the manhole, and his legs and arms were outside it. He did not fall on his head nor did he lose consciousness. The wind was knocked out of him and he had trouble breathing. It was with considerable dif-

ficulty that his fellow workman was able to pull him out of the manhole. At the hearing Mr. Johnston testified that "It was about fifteen minutes before I could get my wind back and I had trouble in breathing. Whenever I took a breath I had a lot of pain in my chest, on the right side, and I had some pain in my back and hip." John Bresina, the fellow worker, testified that after Mr. Johnston was extracted from the hole, he complained that his chest and his right leg hurt. The accident occurred at about 2 p. m. Mr. Johnston remained on the job until the close of the workday at 5 p. m., but did little work after the accident on that day. He had difficulty in breathing that night and experienced pain in his chest. On the following day he consulted Dr. Buckley, who taped his body from mid-line to chest. On December 7, 1953, he experienced pain in the cords of his legs, and had difficulty in moving his right leg. Drs. Buckley and Walter treated him for about six weeks. Dr. Walter testified that one X-ray examination revealed a contusion of the chest, and that another showed a hemothorax (blood in the chest cavity). He stated that an accident such as experienced by Mr. Johnston on December 4, 1953, would have a tendency to increase blood pressure. After the day of the accident Mr. Johnston did not return to work until January 18, 1954. He worked that day and the next one. He told his superintendent that his right leg was numb and that he could not depend on it. He did not work after January 19, 1954. At the suggestion of the superintendent he consulted Dr. Sorenson, an orthopedic surgeon, who treated him thereafter.

At the hearing conducted by the Industrial Commission's examiner, the plaintiff Johnston testified in part as follows (abridged):

"I was referred to the Mayo Clinic at Rochester, Minn., by Dr. Sorenson and I went to the clinic.

"Before I went to Rochester my condition was not very good. My leg was getting worse every day. Every step I

took seemed to lock my knee and my cords felt like they were short in the back and I had pain in the knee and pain in the foot. The leg changed in color and from the knee down to the foot it got all black and blue. Just before I went to Rochester I developed a lump on the calf of my right leg. I soaked the right leg in hot water.

"I was examined at Rochester, including X-ray examinations and given various tests. One of the procedures that they did at Rochester was to take about a half pint of blood out of my system. A brace was prescribed at Rochester to hold my foot level with the ground. My foot drops if I do not wear the brace. My leg feels just like it is numb. The lump that I had noticed on my leg disappeared. The lump was right on the calf on my leg and was on the inner side of the leg. I try to walk around as much as I can now, and my condition has remained the same. My condition has been about the same since May of 1954."

It appears without dispute that previous to December 14, 1953, Mr. Johnston was suffering from polycythaemia (secondary to silicosis), hypertension, and lung fibrosis. However, notwithstanding his physical situation in such regards, he was able throughout the entire time that he worked for the sewer department of the city of Eau Claire to carry on his duties regularly, and was not physically disabled from attending to and performing all work required to be done by his employer. He never had any fainting spells at home or on the job. Previous to his employment with the city of Eau Claire, Mr. Johnston at times *inter alia* had worked in a quarry, and had also been engaged in sandblasting in a steel plant.

The controversy centers on the determination by the examiner of the Industrial Commission, as confirmed by the commission, that to find that Mr. Johnston's disability subsequent to January 17, 1954, was a consequence of the accident would be speculative and conjectural. It is the position of the plaintiff that such finding was unwarranted and without support in the light of the only medical evidence pre-

sented. He points out that but two doctors testified at the hearing, viz., Dr. Walter and Dr. Wishart, and that both testified that the accident of December 4, 1953, was the precipitating factor in causing plaintiff's disability. The defendants, however, maintain that there is credible evidence to sustain the commission's finding, and point out that Dr. Wishart testified that the disability was due primarily to a lesion occurring in the upper motor neuron which in all probability was a cerebral thrombosis, and that his pre-existing ailments—polycythaemia (increase in red cells in the blood causing thickening), with resulting hypertension, all related to silicosis—predisposed him to a cerebrovascular accident; that a cerebral thrombosis could have occurred to Mr. Johnston from any exertion such as having a stool in the bathroom, opening a window, operating an automobile and giving a hard tug at the steering wheel. Also in substantiation of their position the defendants rely upon that portion of Dr. Wishart's testimony wherein he stated that any increase in blood pressure could cause plugging, and that when asked whether it would be speculative to say that the stoppage occurred as a result or as a part of this accident, Dr. Wishart replied: "It's speculative, yes. As a matter of fact, the only way we could prove it would be to look at this man's brain at the time it happened. It's purely speculative until you do that. I mean, everything is an assumption."

The record shows that while Dr. Wishart testified to the effect that any one of a number of types of exertion could have caused a cerebral thrombosis or hemorrhage to Mr. Johnston in his physical condition, nevertheless the doctor stated that in his opinion the exertion connected with Johnston's activities in attempting to move the manhole cover on December 4, 1953, was sufficient to precipitate the plugging, and that considering Johnston's medical record it was more probable that the thrombosis occurred at the time of his accident, and not at an earlier or later date. While he was

a witness at the hearing, Dr. Wishart read from a report dated and signed by him September 9, 1954, and furnished to Mr. Johnston's attorney, which report, however, although appearing of record, was not introduced into evidence. In connection with that report Dr. Wishart testified at the hearing as follows:

"*Q.* Doctor, this report that you submitted you indicated that the causal relationship between the patient's symptoms, signs, physical findings, and the accident referred to, probably does not exist? *A.* That's right.

"*Q.* So the accident had nothing to do with causing the thrombosis? *A.* That's right. Yes."

It is well established that if the evidence before the Industrial Commission in a workmen's compensation case is such as to raise in the minds of the commission a legitimate doubt as to the existence of facts essential to compensation, it becomes the duty of the commission to deny compensation on the ground that the applicant did not sustain the burden of proving to the satisfaction of the commission that the facts were as he claims them to be. *Beem v. Industrial Comm.* (1943), 244 Wis. 334, 337, 12 N. W. (2d) 42; *Melli v. Industrial Comm.* (1956), 274 Wis. 76, 78, 79, 79 N. W. (2d) 225. It is also the rule that while the Industrial Commission may base its findings on a preponderance of probabilities or of the inferences that may be drawn from established facts, it cannot base them on mere possibilities. See *Molinaro v. Industrial Comm.* (1956), 273 Wis. 129, 76 N. W. (2d) 547; *Shymanski v. Industrial Comm.* (1956), 274 Wis. 307, 79 N. W. (2d) 640. In *Molinaro v. Industrial Comm., supra* (p. 133), this court quoted with approval the language in *Creamery Package Mfg. Co. v. Industrial Comm.* (1933), 211 Wis. 326, 330, 331, 248 N. W. 140, as follows:

" 'Mere possibilities leave the solution of an issue of fact in the field of conjecture and speculation to such an extent as to afford no basis for inferences to a reasonable certainty,

and in the absence of at least such inferences there is no sufficient basis for a finding of fact. It will not do to reach a conclusion in favor of the party on whom the burden of proof rests by merely theorizing and conjecturing. There must at least be sufficient evidence to remove the question from the realm of conjecture.' "

True, in the case at bar, Dr. Wishart testified to the effect that it would be speculative to say that the stoppage occurred as a result or part of the accident, and that a thrombosis such as suffered by Mr. Johnston, could have been caused by any one of a number of factors. However, Dr. Wishart expressly testified that from a consideration of the circumstances in which Mr. Johnston had been situated, it was his opinion that the thrombosis occurred at the time of the accident.

Other than Dr. Wishart's own testimony when referring to his previous report, there is no evidence of record to impugn his statement that the disability after January 17, 1954, was a consequence of the accident. To hold that the doctor's statements with reference to "speculation" carry his conclusion entirely within the orbit of mere possibility, would, in our opinion require a construction of his testimony different than that reflected in its context. Were it not for Dr. Wishart's own contradictory statement in evidence that "the accident had nothing to do with causing the thrombosis," we would be obliged to hold that the medical evidence indisputably indicated that the accident caused the thrombosis. The situation then would be similar to that in *Wagner v. Industrial Comm.* (1956), 273 Wis. 553, 565, 79 N. W. (2d) 264, 80 N. W. (2d) 456, where it was held that mere isolated statements taken out of context and completely explained by other testimony given by the physicians were not within the realm of credible evidence to support the commission's findings. In *Wagner v. Industrial Comm., supra,* it was also determined that the commission may not substitute

its own knowledge and experience as evidence, and weigh the same against the uncontroverted medical evidence of record. Quoted there with approval is the statement in *Merton Lumber Co. v. Industrial Comm.* (1951), 260 Wis. 109, 118, 50 N. W. (2d) 42, that:

" 'Counsel for the commission suggests that the knowledge and experience of the commission must be given consideration. We gladly concede it and hope to give it in all proper cases. But while such knowledge and experience is of great value in the appraisal of evidence it is by no means a substitute for evidence. The constitutionality of the Workmen's Compensation Act depends upon the right of judicial review to determine whether the findings are supported by evidence. *Borgnis v. Falk Co., supra.* [(1911), 147 Wis. 327, 133 N. W. 209.] There can be no review of material not in the record and the commission's knowledge and experience is not there. To subject the rights of either employee or employer to decisions based upon facts or expert opinions which do not appear of record would be a denial of due process of law. The findings of fact in the present case cannot be sustained on that principle.' "

At the hearing Dr. Wishart testified that in his opinion there was a causal relationship between the accident and the thrombosis, and he also testified that in a previous report he had stated that the accident had nothing to do with causing the thrombosis.

It was the exclusive function of the commission to reconcile the inconsistent statements made by Dr. Wishart in the course of his testimony. See *Wisconsin Granite Co. v. Industrial Comm.* (1934), 214 Wis. 328, 334, 252 N. W. 155. In *Hinch v. Industrial Comm.* (1951), 260 Wis. 47, 49, 49 N. W. (2d) 714, it was said:

"If it may be considered that there was inconsistency between the reports it was the function of the commission to reconcile them and to determine which is entitled to cre-

182

dence. *Plencner v. Industrial Comm.* 249 Wis. 370, 24 N. W. (2d) 669."

In the case at bar it is manifest that the examiner and the commission were not able to reconcile the testimony of Dr. Wishart in favor of his expressed view that the accident caused the thrombosis. Had they arrived at a determination that in view of other evidence appearing of record, credibility and more weight were to be attached to Dr. Wishart's statement in his testimony that the accident caused the thrombosis than to his statement there that it did not, it would then have been their duty to find that it had. When not able to reach such determination, it was their obligation under the rule of *Beem v. Industrial Comm., supra,* to deny compensation.

We are obliged to affirm the judgment of the circuit court in upholding the commission's determination on review.

*By the Court.*—Judgment affirmed.

BROADFOOT, J., dissents.