GENERAL MOTORS CORPORATION, a corporation of the State of Delaware, Employer-Appellant, v. JOSEPH FREEMAN, Claimant-Appellee.

(*February* 10, 1960.)

TERRY, P. J,, sitting.

*Rodney M. Layton* (of the firm of Richards, Layton and Finger) for the appellant.

*James P. D'Angelo* for the appellee.

Superior Court for New Castle County, No. 395, Civil Action, 1959.

TERRY, P. J.:

This is an appeal from the Industrial Accident Board of this State pertaining to an award of compensation under the Workmen's Compensation Act, 19 *Del. C.* § 2101 *et seq.*

Joseph Freeman, claimant, testified below in substance as follows: that he had not experienced any difficulty with his eyes prior to November 16, 1955, except that his eyes were weak which necessitated the wearing of glasses; that on November 16, 1955, as an employee of General Motors Corporation he was burning trash in the performance of his regular duties at which time he suffered an injury in that smoke impinged upon his eyes causing him to cough and lift his eyeglasses in order to wipe his right eye with his gloved hand and that in the process of wiping his eye a foreign substance entered the eye causing considerable pain and discomfort; that he went to the Corporation's infirmary where a nurse flushed his eye and told him to report back to the doctor the next morning; that he returned to the infirmary the next morning at which time Dr. Weigerink examined his right eye; took therefrom some substance, and placed a black patch over the eye; that the patch so remained for the period of five days; and that when the patch was removed "it looked like a four-leaf clover in front of me." "Looked like some kind of a working sign from the time the patch was taken off."

Freeman contends that during February 1956 as he was driving to work a black spot appeared in front of his eye; that upon his arrival at the General Motors plant he went to the infirmary to see Dr. Weigerink; and that Dr. Weigerink at that time referred him to Dr. LaMotte, of Wilmington, an ophthalmologist.

Freeman contends that for financial reasons he did not go to be examined by Dr. LaMotte until November 5, 1956; that he did see the doctor on that date and was advised that he had a detached retina in his right eye and immediate surgery was advised; that Dr. LaMotte operated a week later resulting in no beneficial aid to his vision; and that by reason of the detached retina he is now totally blind in his right eye.

It is contended that the occurrence of the incidents that took place on November 16, 1955, was the proximate or a contributing cause of the retinal detachment suffered by him, which was discovered by Dr. LaMotte on November 5, 1956.

General Motors concedes employment but denies the existence of any causal relationship between the series of events detailed by Freeman and the retinal detachment, which is no more than conjecture or a suggestion of possibilities, and urges this Court to reverse the award of compensation as entered by the Industrial Accident Board.

Freeman produced before the Board two medical experts, Dr. Edwin A. Goldberg, an optometrist, and Dr. Bayard R. Vincent, an ophthalmologist.

General Motors likewise produced as its medical experts Dr. W. O. LaMotte, Jr., an ophthalmologist, and Dr. Lloyd T. Weigerink, plant physician for the corporation.

Dr. Goldberg testified that he examined the eyes of Freeman on February 27, 1953, at which time the external examination was negative, an extra-ocular type of thing; that the ophthal-

mological examination showed high myopia, but the retina was not detached.

Dr. Goldberg was then asked the following hypothetical question:

"Q. Assuming Mr. Freeman had myopia, as you called it; assuming further, thereafter, that he got smoke and a chemical in his eye—an unknown chemical—in his right eye; assuming further he rubbed his eye, and assuming there was coughing, at times violent coughing; and assuming that no other trauma occurred; and assuming further that shortly thereafter a retinal detachment occurred; would you say that it was medically possible that this trauma caused a retinal detachment?

"A. Yes."

Dr. Vincent testified that he examined the right eye of the claimant on October 30, 1957, and that his examination revealed a retinal detachment in Freeman's right eye, with a loss of vision to the extent that even light perception was questionable.

He then proceeded to define (a) myopia and (b) retinal detachment:

"(a) Myopia is a refractive error of the eye wherein the eyeball elongates or lengthens from the front or anterior portion to the back. As a matter of fact, there are different types of myopia. I think it is a concensus among experts that a malignant myopia, a severe type of myopia, is classified as a disease of the eye rather than and in addition to being a refractive error."

"(b) A retinal detachment is a pathological condition of the eye where the layers of the retina separate. Ordinarily the retina is composed of thin layers, and in a detachment of the retina, the anterior portion of the retina separates from the posterior portion, or the front part; the inner part separates from the outer part."

He was then asked the following hypothetical question:

"Q. Doctor, assuming that Mr. Freeman had myopic type eyes, and assuming he got smoke and an unknown chemical or chemicals in his right eye; and assuming further he rubbed his eye and at times violently; and assuming further that nurses and doctors had touched his eye, and assuming further there was coughing, sometimes violent coughing; and assuming further there was no other trauma occurred, and thereafter a retinal detachment occurred, would you say it was medically possible, if not probable, that this trauma or series thereof could have caused the retinal detachment?

"A. I would say it is or was medically possible."

The doctor further testified that Freeman was highly myopic in the right eye and that fact alone predisposes to retinal detachment. He continued by saying that, aside from other factors in a highly myopic eye, Freeman could have coughed violently, could have sneezed violently, or suffered a contusion which might be a violent rubbing of the eye and cause a retinal detachment.

In cross-examination Dr. Vincent was asked the following questions and gave the following answers:

"Q. Is it correct that the vast majority of cases of retinal detachment are believed to have occurred spontaneously without trauma? A. The vast majority.

"Q. Now, Doctor, when you said that you thought it was possible that trauma could have caused the retinal detachment in the hypothetical situation given to you by Freeman's counsel, did you intend to indicate that it was within the realm of reasonable possibility that the retinal detachment would have occurred solely by reason of the impact upon the eye of the smoke? A. Oh, no.

"Q. Did you intend to indicate that you feel that it was reasonably possible that the result would have occurred by reason of the man's rubbing his eye? A. That could be.

"Q. Now, I would like to find out, if I may, what you mean by 'could be'; do you think that this is the most probable cause in that hypothetical situation of the detachment, or do you recognize the fact that out of many possible causes this is one? A. Out of many possible causes this is one."

Dr. LaMotte testified that he examined Freeman on November 5, 1956; that his examination revealed a high degree of myopia in his right eye and the presence of a detached retina; that his findings were negative as to any destruction, irritation or inflammation that could be caused from the entry of any caustic chemical in the eye; that he operated on the eye a week later without appreciable results. The doctor further testified that the process of detachment of the retina generally speaking is spontaneous, one which occurs instantaneously. However, in cases of severe trauma it may occur precipitously, which process is usually a slowly developed one. The doctor's opinion was that the retina in Freeman's right eye had become detached probably six months to a year prior to November 5, 1956, the date of his examination. Since Dr. LaMotte's remaining testimony is in substance the same as Dr. Vincent's, necessity does not require recitation thereof.

Dr. Weigerink was asked and answered the following questions:

"Q. When a person comes into your organization, that is a new employee, a thorough physical examination is given; is that correct? A. Oh, yes it is.

"Q. In that examination, an examination of the eye is given? A. If they wear glasses we examine them with glasses on.

"Q. Do you happen to know or could you tell from the record here— A. No, that is a separate record. But, here in the first part of December I saw him and the cornea was clear, it had reference to that. I checked his eye; his eye was failing at that time and I wrote down, 'employee feels loss of vision in right eye is due to smoke' * * * and I feel this is a degenerative process of the lens or retina and not due to his occupation. I advised him to consult an ophthalmologist, which is the usual procedure, and I gave him three names."

The Court will not reverse a finding of fact by the Board below if there is evidence in the record from which its findings could have been fairly and reasonably drawn. *Wright v. American Brake Shoe Co.*, 8 *Terry* 299, 90 *A*. 2d 681; *Gooden v. Mitchell*, 2 *Terry* 301, 21 *A*. 2d 197; *Dallachiesa v. General Motors Corporation*, *Del. Super.*, 140 *A*. 2d 137. A causal connection between the act and injury must be established by the complainant by a preponderance of the evidence. *Collins & Ryan v. Hudson*, 6 *Terry* 438, 75 *A*. 2d 261. The question before me, therefore, is whether or not there is competent evidence in the record from which the Board's findings and award could have been reasonably drawn.

General Motors contends that the area in which this case falls is so highly specialized that expert medical testimony alone must establish that the occurrence of the incidents that took place on November 16, 1955 did in fact or did probably constitute the sole cause or a contributing cause of the detached retina as suffered by Freeman. Otherwise, it is contended that we drift into the field of conjecture or speculation which can never form the basis of the required proof of causation.

*Larson, Workmen's Compensation Law,* Volume 2, Section 79.54, Page 303, states "* * * reliance on lay testimony and administrative expertise is not justified when the medical question is no longer an uncomplicated one and carries the fact finders into realms which are properly within the province of

medical experts." *George T. Stagg Co. v. O'Nan,* 286 *Ky.* 527, 151 *S. W.* 2d 51; *Riehl v. Town of Amherst,* 308 *N. Y.* 212, 124 *N. E.* 2d 287; *Shymanski v. Industrial Commission,* 274 *Wis.* 307, 79 *N. W.* 2d 640; *Oscar Mayer & Co. v. Industrial Commission,* 219 *Wis.* 474, 263 *N. W.* 88; *Arkin Construction Co. v. Simpkins, Fla.* 99 *So.* 2d 557; *Johnston v. Industrial Commission,* 3 *Wis.* 2d 173, 87 *N. W.* 2d 822; *Josi's Case,* 324 *Mass.* 415, 86 *N. E.* 2d 641; *McCormick Transportation Co. v. Barone,* 8 *Terry* 202, 89 *A.* 2d 160; *Ducker v. Dunean Mills,* 218 *S. C.* 465, 63 *S. E.* 2d 314.

Freeman contends that the mere fact a medical expert uses such expressions as "might," "could," "possible," or "may have," or phrases similar thereto, does not preclude a finding of causal relationship provided there be other circumstances shown by the evidence in support of the conclusion. In other words, it is contended that causal connection is generally a matter of inference and possibilities may often play a proper and important part in the argument which establishes the existence of such relationship. Thus, it is urged that the medical expert in testifying as to a present or past condition may express his opinion as to causal relationship in terms of possibility.

Freeman finally contends that when the medical testimony in the present case is considered in the light of the nonmedical testimony, as disclosed by the record, there are found adequate circumstances to support the award of the Board below.

*Larson on Workmen's Compensation Law,* Volume 2, Section 80.32, Page 322, states that "the distinction between probable and possible should not follow too slavishly the witnesses' choice of words as sometimes happens in respect to medical testimony. A doctor's use of such words as 'might,' 'could,' 'likely,' 'possible,' and 'may have,' coupled with other credible evidence of a nonmedical character, such as a sequence of symptoms or events corroborating the opinion, is sufficient to sustain an award." 100 *C. J. S. Workmen's Compensation* § 547 (10);

*Sharp v. Esso Standard Oil Co., La. App.,* 72 *So.* 2d 601; *Carpenter v. Sibley, Lindsay & Curr Co.,* 302 *N. Y.* 304, 97 *N. E.* 2d 915; *Industrial Commission v. Royal Indemnity Co.,* 124 *Colo.* 210, 236 *P.* 2d 293; *Indiana Power & Water Co. v. Miller,* 73 *Ind. App.* 521, 127 *N. E.* 837; *Magazine v. Shull,* 116 *Ind. App.* 79, 60 *N. E.* 2d 611; *Blackfoot Coal & Land Corp. v. Cooper,* 121 *Ind. App.* 313, 95 *N. E.* 2d 639; *Eureka Chevrolet Co. v. Franklin,* 126 *Ind. App.* 435, 131 *N. E.* 2d 330; *Continental Steel Corp. v. Fitch,* 127 *Ind. App.* 224, 137 *N. E.* 2d 450; *Atkinson v. United States Fidelity & Guaranty Co., Tex. Civ. App.,* 235 *S. W.* 2d 509; *Di Fiore v. United States Rubber Co.,* 78 *R. I.* 124, 79 *A.* 2d 925; *Flocco v. E. I. du Pont de Nemours & Co.,* 3 *N. J. Super.* 109, 65 *A.* 2d 619; *Dole v. Industrial Commission,* 115 *Utah* 311, 204 *P.* 2d 462.

It is indeed a gross misconception to say that certain awards are not valid because of the lack of a positive medical finding as to causal relationship, or that the disability "in all probability" or "very probably" resulted from the injuries complained of.

■ Necessity requires a medical diagnosis in many cases in order to establish causal relationship between the injury and the disability, but this is not invariably so. See *DiFiore v. United States Rubber Co.,* 78 *R. I.* 124, 79 *A.* 2d 925. Thus in cases involving a sequence of circumstances, medical evidence, although desirable, is not indispensable for an injured employee to make out a *prima facie* case, especially if the nonmedical testimony is sufficient and undisputed. *Harrington's Case,* 285 *Mass.* 69, 188 *N. E.* 499 (Aggravation of hernia by strain); *Hampton Roads Stevedoring Corporation v. O'Hearne,* 4 *Cir.,* 184 *F.* 2d 76; *Johnson v. Valvoline Oil Co.,* 131 *Pa. Super.* 266, 200 *A.* 224 (Death from poisonous fumes).

■ On the other hand, reliance upon nonmedical testimony should not be made the basis of an award if the medical question presented is no longer an uncomplicated one and carries the fact finders completely into realms which are properly

within the province of medical experts. 2 *Larson's Workmen's Compensation Law*, Section 79.54. For example, in the case of *Drakulich v. Industrial Commission*, 137 *Ohio St.* 82, 27 *N. E.* 2d 932, 934, where an employee strained his back by accident and died a year later of cancer of the liver, the court held that an award for death benefits could not stand in the absence of expert medical testimony tracing the definite or probable causation of the death to the accident. *Travelers Insurance Company v. Blazier, Tex. Civ. App.*, 228 *S. W.* 2d 217.

In the present case, a different problem is presented; that is, in a case where medical testimony is essential to a proper determination of the existence of causal relationship, will such testimony evidencing only the "possibility" of causal relationship suffice, provided there exists a sequence of events between the injury and the disability from which a fair and reasonable inference of causal relationship can be drawn? It is apparent to me that the etiological factors involved in the initiation and progress of a detachment of the ophthalmic retina are not matters which fall within the common experience and capability of lay persons, nor within their capacity to judge in the absence of expert medical assistance.

However, it is a common experience in cases of this kind to find that the more distinguished a medical witness is, the more qualified become his statements. He may, for example, testify that a sledge hammer blow upon the claimant's head might have caused the series of headaches complained of, but would hesitate to say positively or probably that such was the only possible cause, and may concede upon cross examination that there could conceivably be other causes.

I am of the opinion that the rule to be followed in this State concerning this question should be that medical testimony connoting mere "possibilities" when standing alone, that is, in the absence of a sequence of occurrences from the time of the injury to the date of disability, would not be sufficient to

sustain an award under the Workmen's Compensation Act, as the medical testimony in such a situation should be "positive" or at least "probable" in order to establish the causal relationship. However, when such testimony is coupled with other testimony establishing a sequence of circumstances of sufficient import to justify a fair and reasonable inference of causal relationship, then the testimony in its entirety will suffice as a basis for an award of compensation.

■ When the testimony in this case is taken into consideration in its entirety, both nonmedical and medical, it is adequate to form the basis for an inference that causal relationship has been sufficiently established.

■ This Court may not substitute its judgment for that of the Board below, unless the finding by the Board is manifestly against the weight of and has no foundation in the evidence. This Court cannot say that the finding by the Board below is manifestly against the weight of the evidence.

The decision of the Board below will therefore be sustained and its award of compensation to Freeman affirmed.

An Order will be entered upon motion.