BRAUN and others, Appellants, v. INDUSTRIAL COMMISSION and another, Respondents.*

*September 6—October 3, 1967.*

---

* Motion for rehearing denied, without costs, on November 28, 1967.

50

For the appellants there was a brief by *Kivett & Kasdorf,* attorneys, and *Nonald J. Lewis* of counsel, all of Milwaukee, and oral argument by *Mr. Lewis.*

For the respondent Industrial Commission the cause was argued by *James P. Altman,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

CURRIE, C. J.   The following issues are presented by this appeal:

(1) Did the commission deny the appellants due process, when it decided a controversy wherein the credibility of the witnesses was a material element, without the benefit of the examiner's personal impressions of the witnesses' testimony?

(2) Is there credible evidence to sustain the commission's finding that the medical and hospital bills ordered paid were reasonably required to cure and relieve Brasted from the effects of the July 4, 1964, injury?

(3) Was there an unreasonable refusal by Brasted to submit to or follow competent and reasonable medical treatment which would bar him from benefits?

(4) Did the commission exceed its powers in reserving jurisdiction to "issue such further orders as may be necessary?"

*Due Process.*

The record leaves no doubt that Brasted stepped on a sharp object prior to July 9, 1964. However, the only one who could know whether he was performing service

growing out of and incidental to his employment at the time of this accident was Brasted. Thus, his credibility was crucial to the issue of whether the accident was compensable under the Workmen's Compensation Act. As is very apparent from his findings, the examiner chose not to believe Brasted. We quote from such findings as follows:

". . . there is much doubt cast upon the applicant's testimony as to whether he stepped on a tack or a roofing nail, by virtue of his histories given to the various doctors and his testimony at the hearing; that he has at times referred to the object stepped on as a one-inch long roofing nail and at other times as a tack and at other times as a thumbtack; that immediately after the alleged incident, the applicant rode up in the elevator from the basement of the building to the fourth floor, where he lived and that he did not mention the alleged incident to the elevator man who was also an employe of the respondent; that after the alleged incident, the applicant left the building and went to lunch at the George Webb restaurant; that the applicant told the insurance company representative that he didn't know where he got the tack when he was interviewed by him in the hospital on or about July 16, 1964; that the applicant did not report the incident to his employer, but that the employer found out about the alleged injury on the premises from the county hospital; that the applicant testified to having been treated after the incident and before going to the hospital, by a Mrs. Theisen, but that although this woman was available as a witness, the applicant failed to call her to testify as to the incident and what the applicant had told her about how he got his injury; that the applicant failed to tell anyone of the alleged injury until he arrived at the County Hospital on July 9, 1964; that, therefore, the applicant did not sustain an accidental compensable injury on July 4, 1964; . . ."

The ultimate responsibility for fact-finding is upon the commission and not the examiner, and thus it is the commission's findings which the court scrutinizes to see whether there is credible evidence which, if unexplained,

would support the finding.[1] However, when the commission reverses its examiner and makes contrary findings and the credibility of witnesses is at issue, a question of denial of due process may arise. This court declared in *Shawley v. Industrial Comm.:* [2]

"Where credibility of witnesses is at issue, it is a denial of due process if the administrative agency making a fact determination does not have the benefit of the findings, conclusions, and impressions of the testimony of each hearing officer who conducted any part of the hearing. [Citing cases.]" [3]

In *Shawley* two hearings were held before two different examiners. The findings and order dismissing the application were signed by Examiner Martin who conducted the second hearing. Retelle, the other examiner, had died in the meantime. On review the commission modified the findings and order, but, as so modified, the order still dismissed the application. The commission in so acting had the benefit of the notes of the deceased examiner. The attorney general contended that this was sufficient to obviate any denial of due process. This court rejected such contention and stated:

"We do not consider that the availability of Examiner Retelle's notes, summarizing the testimony of the medical witnesses who appeared before him, is sufficient to meet the test of due process. This is because these notes do not embody Examiner Retelle's conclusions with respect to the personal impression the witnesses made upon him. Such conclusions might play a very material part in determining the weight to be given to the testimony of the two Mayo physicians as opposed to the testimony of

[1] *Ace Refrigeration & Heating Co. v. Industrial Comm.* (1966), 32 Wis. 2d 311, 145 N. W. 2d 777. No issue of due process was therein raised.

[2] (1962), 16 Wis. 2d 535, 114 N. W. 2d 872.

[3] *Id.* at pages 541, 542. See also *Wright v. Industrial Comm.* (1960), 10 Wis. 2d 653, 103 N. W. 2d 531, and *Falke v. Industrial Comm.* (1962), 17 Wis. 2d 289, 295, 116 N. W. 2d 125.

Dr. Wirka, whose appearance was fresh in the mind of Examiner Martin at the time he made his original findings and order." [4]

In the instant case the examiner's notes also constitute part of the record, and it will be assumed that the commission had the benefit thereof when it made its findings. However, like Examiner Retelle's notes in *Shawley*, the instant examiner's notes do not embody his conclusions with respect to the personal impressions that the witnesses made upon him. For example, there is no mention of the witnesses' demeanor during their testimony. Where, as here, witnesses have directly contradicted each other, the impression the fact finder has of their demeanor is likely to be the decisive factor in determining who is telling the truth.

The attorney general requests this court to invoke the presumption of regularity and presume that the examiner was available to the commission for consultation and that the commission did consult with him before making its findings. This we refuse to do. In situations where an examiner hears conflicting testimony and makes findings based upon the credibility of witnesses, and the commission thereafter reverses its examiner and makes contrary findings, the record should affirmatively show that the commission had the benefit of the examiner's personal impressions of the material witnesses. This may take the form of either adequate notes of the examiner or personal consultation with him. The demands of due process cannot be satisfied with anything less.

Because the instant record does not show that the commission, in making its findings, had the benefit of the examiner's impressions of the material witnesses on

---

[4] *Id.* at page 542. If Examiner Retelle's notes had reflected his personal impression of the witnesses, this would have satisfied the requirements of due process. *Falke v. Industrial Comm., supra,* footnote 3, at page 294.

which he grounded his conclusions of credibility, there must be a reversal with directions to remand to the commission for further proceedings.

### Evidence With Respect to Medical and Hospital Bills Ordered Paid.

In its findings of fact the commission found:

". . . that applicant required medical treatment and incurred reasonable expense to Dr. Gale Mendeloff in the sum of $333.75; to Dr. N. F. Gordon, $375.00; to Laabs, Inc., $44.18; to Universal Ambulance, $35.00; to Dr. John Temple, $60.00; to Dr. Roger Hepperla, $50.00, and to Columbia Hospital, $1,309.76; that from the record it is not clear what additional expense incurred to Columbia Hospital is attributable to this injury and reservation is made as to such quesion . . . ."

Since the foregoing follows the finding that Brasted on July 4, 1964, "sustained accidental injury in the course of and incidental to his employment," the commission must have concluded that Brasted required such medical treatment as a result of his accidental injury.

Appellants contend that many of these medical and hospital expenses were for unconnected ailments not medically or otherwise related to Brasted's foot injury. They concede that, if the foot injury is compensable and there was evidence that these other ailments were aggravated thereby, appellants would be liable for such expenses.[5] Their position is that evidence of aggravation is lacking.

[5] In *Cahill v. Franklin Trust Co.* (Sup. Ct. 1937), 15 N. J. Misc. 409, 191 Atl. 748, a diabetic workman stubbed his toe on the foot of a chair. Gangrene developed, and his leg was eventually amputated below the knee. The court held that the stubbing aroused a diabetic tendency to gangrene from a traumatic cause. It was held compensable.

In *Borden's Dairy v. Zanders* (Fla. 1949), 42 So. 2d 539, a diabetic workman dropped a large can on his big toe. His leg

Our review of the record discloses that the following medical expenses are properly attributable to the foot injury:

Dr. Mendeloff $333.75 (the surgeon who treated the foot injury and performed two skin graft operations),

Dr. Temple $60 (anesthesiologist who assisted in one operation),

Dr. Hepperla $50 (anesthesiologist who assisted in other operation),

Laabs, Inc., $44.18 (supplied bandages used in care of injured foot),

Universal Ambulance $35 (provided ambulance which transferred Brasted from one hospital to another).

Two items remain in dispute—Dr. Gordon $375 and Columbia Hospital $1,309.76.

Dr. Gordon did not testify. However, his one page medical report to an attorney was received in evidence. He had Brasted under his care at Columbia Hospital and treated him for his diabetes. His report, however, does not state that the diabetes was aggravated by the foot injury. The sole evidence bearing thereon was Dr. Mendeloff's testimony ". . . that at least the diabetes would be more difficult to treat and control in face of an infection than if the man did not have an infection." We deem this insufficient to support allowance of Dr. Gordon's $375 bill. There is entirely lacking any proof to what extent Brasted's diabetic complications, for which he was treated by Dr. Gordon, stemmed from the foot injury.

Most of the Columbia Hospital bill of $1,309.76, is attributable to room service and treatment of the foot. Dr. Mendeloff testified that, disregarding any other causes or ailments that the patient might have had at the time, the condition of his foot warranted this period of stay at Columbia Hospital. However, the

---

was eventually amputated. The court held that the injury to the toe aggravated a preexisting disease, resulting in the need for the amputation. It was held compensable.

hospital statements show charges for X rays and laboratory fees incurred in exploring Brasted's other ailments such as polyneuropathy, toxic confusional state, and hypoalbuminemia. Dr. Millin was called into consultation by Dr. Gordon because of the polyneuropathy and toxic confusional state. Both Dr. Millin and Dr. Evans testified that there was no connection between the alleged accidental injury and respondent's toxic confusional state, polyneuropathy, and vascular disease. (Dr. Evans was the physician who examined Brasted in behalf of appellants.) There is no testimony that the ailments, other than the diabetes, were caused by or aggravated by the foot injury. Dr. Millin testified that the hospital charges were separable.

The evidence in the record does not support the allowance of the entire bills of Dr. Gordon and Columbia Hospital. Upon remand the commission may desire to take further testimony with respect to these bills.

### Refusal to Follow Treatment.

As previously indicated, skin grafting was performed on Brasted's foot on August 21, 1964. On August 26th he signed himself out of the hospital. He walked on his new grafts. On August 28th he returned to the hospital. On September 1st he again signed himself out of the hospital. From that date to December 29, 1964, the date of the second examiner's hearing, he was being treated by two doctors at their offices as an outpatient. Treatment was expected to continue.

Dr. Gordon, in his report admitted into evidence, stated that Brasted's leaving the hospital on August 26th, and again on September 1st, was "against medical advice."

Dr. Mendeloff stated at the December 29, 1964, hearing that had Brasted followed medical advice, his foot "would

have stood a 60 to 70 percent chance of being completely healed by now . . . ."

Dr. Evans stated on the same date that Brasted's leaving the hospital delayed his recovery period "very significantly." He also stated that the second departure was a "delaying and complicating event."

Sec. 102.42 (7), Stats., provides in part:

". . . no compensation shall be payable for the death or disability of an employee, if his death be caused, or insofar as his disability may be aggravated, caused or continued (a) by an unreasonable refusal or neglect to submit to or follow any competent and reasonable medical or surgical treatment . . . ."

The attorney general argued that such "treatment" is of the whole man. Brasted was hospitalized for eight weeks. He was depressed. He received no visits from his family. The attorney general argues that it was not unreasonable for Brasted to leave the hospital. He continued to receive medical treatment thereafter.

This argument is amiss. The unreasonableness of a claimant's actions is judged by an objective standard. The employer may have to take an employee "as he is" in regard to his physical injury, but not as to his refusal or neglect to follow competent and reasonable medical treatment.

In *Kill v. Industrial Comm.*,[6] the claimant had injured his wrist. Against medical advice he engaged in a boxing match at a time when his wound was practically healed. The court denied him compensation for the complications resulting from the infection in his wound that ensued after the fight. Counsel therein argued that the original injury must still be regarded as the proximate cause. The court held:

"That injury had been healed and cured, sufficiently at least that had it not been for the bout voluntarily

---

[6] (1915), 160 Wis. 549, 152 N. W. 148.

entered into with knowledge of the danger the injuries complained of would not have occurred. . . . The injury must be proximately caused by the accident and not self-inflicted." [7]

Professor Larson has stated:

"If the claimant, instead of allowing his wound to heal, deliberately engages in conduct which presents a strong probability of reopening the wound, the re-injury is not compensable." [8]

This is an instance, however, where the commission has made a finding of fact, which should be conclusive if any credible evidence may be found to support it.[9] The commission found that Brasted was temporarily totally disabled from July 4 to December 29, 1964.

There was no specific testimony at the hearings as to when Brasted's wound would have healed had he not left the hospital. The testimony is only to the effect that his leaving delayed the ultimate recovery and that the wound probably (60–70 percent chance) would have been healed by December 29, 1964. The commission's finding of disability and reasonableness of expenses incurred up to December 29, 1964, does not seem to be so inherently unreasonable as not to be entitled to any weight.[10] However, it is manifest that Brasted was unreasonable in leaving the hospital and that his intentional

---

[7] *Id.* at page 553.

[8] Larson, Law of Workmen's Compensation, p. 192.88, sec. 13.22. At 99 C. J. S., *Workmen's Compensation*, p. 1141, sec. 318, it is stated: "A workmen's compensation claimant is under a general obligation to adopt reasonable measures to minimize damages, and he has no privilege either by intent or imprudence to intensify or prolong his disability at his employer's expense."

[9] *Chain Belt Co. v. Industrial Comm.* (1925), 188 Wis. 414, 417, 418, 206 N. W. 209.

[10] *Van Valin v. Industrial Comm.* (1962), 15 Wis. 2d 362, 367, 368, 112 N. W. 2d 920.

action impeded his final cure. Any further claim for benefits after December 29, 1964, should be looked upon with strict and discerning scrutiny by the commission.

### Reservation of Jurisdiction.

Appellant's attack on the commission's reservation of jurisdiction goes to the issue of permanent disability. Its reservation of jurisdiction to "issue such further orders as may be necessary" is ambiguous as to whether such reservation extends to award benefits for possible future permanent disability.

The commission expressly found Brasted had not sustained any permanent disability, "at least not to the present." "The present" is June 7, 1965, the date of its findings and interlocutory order. The only evidence on permanent disability was testimony by Dr. Mendeloff who stated, "I do anticipate full healing however."

Under the holding of *California Packing Co. v. Industrial Comm.*,[11] there is a total failure of evidence to sustain a reservation of jurisdiction to award benefits for future permanent disability. The commission would have exceeded its powers if it had made such a reservation. Therefore, the instant reservation of jurisdiction made by the commission must be construed as not extending to permanent disability.

*By the Court.*—Judgment reversed, with directions to set aside the findings and order of the commission and to remand the cause for further proceedings not inconsistent with this opinion.

---

[11] (1955), 270 Wis. 72, 70 N. W. 2d 200.