BURTON, Appellant, v. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS and others, Respondents.*

No. 210. *Argued April 1, 1969.—Decided June 27, 1969.*
(Also reported in 168 N. W. 2d 196, 170 N. W. 2d 695.)

* For disposition of motion on rehearing, see post, p. 228a.

220

For the appellant there was a brief and oral argument by *John A. Moore* of Oshkosh.

For the respondent Department of Industry, Labor & Human Relations the cause was argued by *Gordon Samuelsen,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

ROBERT W. HANSEN, J.   This claim for workmen's compensation benefits by an Oshkosh fireman involves a preexisting condition and two incidents, the first work-connected and the second not work-connected.  If a link exists between the two incidents, the applicant is entitled to benefits under the compensation act.  If such link does not exist, the claim for benefits under the compensation act fails.

The preexisting condition is an abnormal growth of bone in the lumbosacral region so that the projection from the fifth lumbar vertebra touches the sacrum.

The work-connected incident took place on May 25, 1964.  While employed as a fireman for the city of Oshkosh, plaintiff slid down a pole in the firehouse.  He released his hold earlier than he should have and fell three or four feet to the floor.  Upon being jolted by the fall, he felt a sharp pain in his back.  The city physician, Dr. James V. Meli, took X rays and diagnosed plaintiff's injury as acute lumbosacral strain and prescribed a lumbosacral support.  Plaintiff missed no work, but had continuing pain and wore the lumbosacral support.

The incident unconnected with his work occurred nine months after the first incident.  Plaintiff became ill with the flu on February 18, 1965, and stayed home from work.  On February 20, 1965, while at home, plaintiff had a sneezing attack, fell to the floor and felt a severe pain in his back, the pain radiating down into his legs.  He was taken to a hospital where he remained for one month and received physiotherapy treatment for a month there-

after. He returned to work on April 20, 1965, and continued to work until September 12, 1965, when, because of back pains, he was home for two weeks. After he returned, he took a desk job with the department.

When the applicant filed his claim for benefits, two hearings were held before hearing examiners: One on March 9, 1966, the other on October 17, 1966. The two hearing examiners, on November 29, 1966, issued an interlocutory order that certain medical expenses be paid on the basis of findings that "the applicant's back disability is the proximate result of his accidental injury on May 25, 1964 [the pole-sliding incident] and arose out of his employment with respondent . . . ." Following petition for review, on January 26, 1967, the commission made an order dismissing the application, which had the effect of reversing the recommendation of the examiners.

In evaluating a situation in which the commission reverses the recommendation of its examiner or examiners, it is to be kept in mind that the primary fact finder is the agency, not the hearing officer. The dominant power to make findings of fact is in the agency heads, not in its hearing officers. One writer has termed this a recognition of the substantive difference between the power to recommend and the power to decide.[1]

However, when the commission or department elects not to follow the recommendation of its hearing examiner, a special situation exists. This is particularly true where the credibility of witnesses is in issue. Of such situation this court has said that "In the area involving credibility of witnesses based on demeanor, the internal procedure of the commission is necessarily not perfect because the members of the Industrial Commission who make the finding do not personally see and hear the witnesses."[2] In fact, this court has stated that

---

[1] 2 Davis, *Administrative Law Treatise*, p. 12, sec. 10.03.

[2] *Falke v. Industrial Comm.* (1962), 17 Wis. 2d 289, 295, 116 N. W. 2d 125.

". . . the procedure within the commission is appellate in many respects . . ." and "Such cases present a special problem to the commission which should be recognized by it under its fact-finding process." [3]

The importance of the opportunity to observe the witnesses at the time of their testifying in determining credibility was clearly indicated by this court in a case in which a finding of the industrial commission was set aside even though it had sustained the examiner's report, where the examiner died who had heard part of the medical testimony and another examiner completed the hearings. [4]

This case is mentioned solely to emphasize the importance of the opportunity to observe the witnesses in determining credibility in the decision-reaching process. Where credibility of a witness or of several witnesses is a substantial element in a case, this court has clearly stated that an administrative agency cannot decide the controversy without the benefit of participation of the hearing officer who heard such testimony. [5]

It is this recognition of the importance of observing manner of testifying, demeanor, hesitancies and inflections that underlies the result reached in *Braun v. Industrial Comm.* [6] There the commission also had made findings reversing the recommendation of its examiner. The examiner's notes were part of the record, but they did not include his conclusions with respect to the personal impressions that the witnesses made upon him. This court held this omission to require reversal commenting ". . . the impression the fact finder has of their [witnesses'] demeanor is likely to be the decisive factor in determining who is telling the truth." [7]

---

[3] *Id.* at pages 294, 295.

[4] *Shawley v. Industrial Comm.* (1962), 16 Wis. 2d 535, 114 N. W. 2d 872.

[5] *Falke v. Industrial Comm., supra,* footnote 2, page 295.

[6] (1967), 36 Wis. 2d 48, 153 N. W. 2d 81.

[7] *Id.* at page 57.

The court in *Braun* concluded:

"In situations where an examiner hears conflicting testimony and makes findings based upon the credibility of witnesses, and the commission thereafter reverses its examiner and makes contrary findings, the record should affirmatively show that the commission had the benefit of the examiner's personal impressions of the material witnesses." [8]

It was on this basis and in the light of the *Braun* decision that, on the first judicial review of this commission order, the circuit court reversed and remanded, finding that the record did not show that the commission, in making its findings reversing its examiner's recommendations, had the benefit of the examiner's impression of the material witnesses on which he grounded his conclusions of credibility. So the case was remanded to the commission and subsequently returned to the courts for a second review with the following sentence appended to its order: "The commission has now reviewed the record and has consulted with Examiners Collins and Dodge, and the matter is before it for decision." This certification is weakened, not strengthened, by the explanation that the impressions of the examiners concerning the credibility of various witnesses had been conveyed to (the) deputy administrator of the workmen's compensation division, who certified that such impressions were relayed to and considered by the commissioners in reaching their decision in this matter. The filtering of the impressions of the examiners through a department executive is not exactly "consulting" with the examiners, except under a very broad definition of the word. However, the bare bones requirement of *Braun* and the circuit court mandate in this case have been met, and that is sufficient to meet the due process test.

However, it is clear that the problem facing a judicial review of the record here has not been eased. The

---

[8] *Ibid.* at page 57.

circuit court in the first review analyzed in detail the medical testimony of the doctors who testified. The reversal and remand for further proceedings added the suggestion that the commission or department "take a long, hard look at the evidence to determine whether or not the pole-sliding incident so weakened the disc structure that a simple sneeze at home brought on the herniation." Whether or not this suggestion was followed, it is clear that only a memorandum opinion accompanying the reversal of the examiners' findings could present to a reviewing court what was being sought: to wit, some indication why the testimony believed by the examiners who heard it presented was deemed not worthy of belief by the agency heads and similarly some indication as to why the testimony not believed by its examiners was believed by the agency heads. It would have been proper, prudent and helpful to the reviewing court if the agency had accompanied its supplemented findings with a statement or memorandum opinion covering this subject. That is particularly true in this case where the written opinion of the circuit court on the first review indicated some puzzlement and concern at the reversal of the recommendation of the examiners. We stop short of requiring a written opinion in all cases involving reversal of an examiner's recommendation where credibility of witnesses is directly involved and a principal issue in the case. However, something more than facilitating judicial review in appellate proceedings is involved. Where there is nothing in the record dealing with the reversal of the recommendation of the examiner on an issue of credibility, the reviewing court cannot speculate or conjure up some appropriate explanation. The total absence of reasons stated for the reversing of examining recommendations takes from the commission or departmental findings an additional strength that it would otherwise have on appeal.

Actually, the impact upon this particular case of the absence of accompanying memorandum opinion is less

than it might be in future cases. Here the basic question as we see it is whether the medical testimony on which the department relied is credible as a matter of law, rather than to be believed as weighed against conflicting medical testimony.

While there are differences in the medical testimony in other regards, the crucial point is as to whether the pole-sliding incident weakened the plaintiff's back so as to permit the disc protrusion when the sneeze occurred nine months later.

The applicant's treating orthopedic surgeon, Dr. W. F. Kennedy, testified that the pole incident of May 25th did so weaken the applicant's back, specifically weakening the annulus and other ligaments so that there was a disc protrusion when the sneeze occurred on February 20, 1965. Dr. N. Scheuermann, who first saw the applicant on February 20, 1965, testified that the sneeze at home probably caused the disc protrusion but that the pole incident of May, 1965, weakened the wall of the disc so that the sneeze caused the disc to protrude.

Dr. E. F. Winter, testifying for the city, first examined applicant on February 24, 1965, and he stated that the disc protrusion was caused by the cough or sneeze of February 20, 1965. This testimony may differ in degree, but not in substance, from the testimony by the two other doctors. It does not deal with the weakening of the wall attributed to the pole-sliding accident by the other two medical witnesses. As to the linkage between the two incidents, Dr. Winter testified that he would not associate them giving as his only reason the elapsing of nine months' time. There is no indication that he either knew or gave consideration to the fact that the applicant had near continuous pain from the pole-sliding incident for the nine-month period, corroboration of continued irritation.

It is undisputed that Dr. Winter did not see the applicant after September 25, 1965, and, therefore, his testimony does not controvert or reach the testimony of Dr.

Kennedy that the applicant's condition changed during the eighteen months preceding the hearing. Dr. Kennedy examined the applicant on November 12, 1965, again in February, 1966, and again in April, 1966. His testimony, uncontroverted and unchallenged, is that the applicant's symptoms and condition had changed in the period following the applicant's last examination by Dr. Winter. Dr. Kennedy specified the nature of the change:

"*A.* His examination by me in November, 1965, which I previously testified to, subsequently in February, 1966, and again in April, 1966, all indicated that what had apparently been previous pressure on a nerve root, according to Dr. Winter was no longer present; and clinically his tests did not show the nerve root was under pressure. Specifically, he had no reflex changes. He had no numbness and he had no limitation of his straight leg raising."

Thus, Dr. Kennedy testified that the disc symptoms changed since the time of Dr. Winter's examination. Dr. Kennedy additionally stated that he did not doubt that there was clinical evidence as to what Dr. Winter found at the time Dr. Winter found it. In fact, Dr. Kennedy testified that his conclusions at that time would have probably been the same as those reached by Dr. Winter. However, since his subsequent physical examinations did not localize the difficulties to the same interspace found by Dr. Winter, a different conclusion follows.[9] There

---

[9] The testimony of Dr. Kennedy on this point is as follows:

"*A.* I don't doubt he had clinical evidence of a disc protrusion when Dr. Winter saw him. He has a positive myelogram now, but his physical examination doesn't localize his difficulties to that interspace at the present time.

"*Q.* Go ahead.

"*A.* And when you say—I see no errors in the testimony given before. I did not examine the patient when he had acute symptoms, and Dr. Winter did, and I would allow from the findings he recorded that my conclusions would have been the same.

is no evidence in the record to contradict this testimony as to change of symptoms subsequent to the examination by Dr. Winter. Nor is there any challenge to Dr. Kennedy's testimony that such changes destroy the applicability of Dr. Winter's earlier-based analysis.

The situation presented is not a matter of choosing between conflicting conclusions reached by differing doctors. Dr. Kennedy testified that Dr. Winter's conclusion was irrelevant because of a change in symptoms and condition of the applicant following the last examination by Dr. Winter. This goes beyond weakening the testimony of Dr. Winter. Because of the time factor and change of physical condition involved, it makes such testimony irrelevant.[10] Medical testimony that on the record must be found to be irrelevant loses its probative value. It cannot be relied upon to sustain a department finding of nonlinkage. We conclude that as a matter of law there is no credible evidence in this record to sustain the department's conclusion that the pole-sliding incident did not so weaken the disc structure so that a simple sneeze at home brought on the herniation. When the trial examiners based their recommendation on the medical testimony offered by the applicant, they not only relied upon credible medical evidence, but also relied upon

"*Q.* But the symptoms have subsided since?
"*A.* The symptoms have changed since that time."

[10] In a recent case decided by this court, *Reich v. ILHR Department* (1968), 40 Wis. 2d 244, 264, 161 N. W. 2d 878, the credibility of a medical witness was involved. There the doctor had given the insurance carrier his opinion as to causation of injury without knowledge of a pan-lifting incident relied upon for recovery of compensation benefits. However, the doctor was present at the hearing, heard the testimony of the applicant, and "Assuming the incident with the pans, with the weight that she described, . . ." gave his opinion that such an incident would not be sufficient to cause a protruded or herniated disc. The hypothetical question and his answer spanned the time gap and supplied the factor not known to him at the time of his actual examination of the applicant.

the only medical evidence that as a matter of law is to be found credible. When the department reversed such recommendation, it exceeded the scope of its authority and reached a finding and conclusion not supported by evidence that can be found to be on this record credible.

It is ordered that the judgment of the circuit court affirming the commission's order be reversed and the cause remanded to the department for further proceedings consistent with this opinion. Specifically, the department is instructed to reinstate the findings and award of the examiners and to hear whatever additional evidence applicant may present on the issue of permanent disability.

*By the Court.*—Judgment reversed with directions to remand to the industrial commission for further proceedings consistent with this opinion.

The following memorandum was filed September 30, 1969.

PER CURIAM. (*on motion for rehearing*). The brief of the attorney general points out the mandate and the last paragraph of the opinion are inconsistent with the rest of the opinion. Such inconsistency will be corrected. We point out, however, it is not the law that the department can set aside an examiner's findings "for any reason or for no reason." The commission's fact-finding process and each step therein are subject to the dictates of due process and review by this court in passing upon the findings made by the department.

Since the present state of the record does not support the findings as made by the commission and this matter had to go back to the department for further proceedings, we meant in our original opinion that the findings and the award of the examiner should be a starting point for the future proceedings; consequently, we said they should

be reinstated. We think the proper procedure is to reinstate those findings and award and for the commission to again consider the testimony already taken and such additional testimony as the parties wish to present on all issues in dispute and to make new and complete findings thereon.

*By the Court.*—The last paragraph of the opinion and the mandate are withdrawn and the judgment is reversed with directions to remand the cause to the department for further proceedings consistent with the opinion as modified upon the rehearing.