Brown, Respondent, v. Industrial Commission and others, Appellants.*

*February 4—March 8, 1960.*

* Motion for rehearing denied, without costs, on May 3, 1960.

For the appellant Industrial Commission the cause was argued by *Beatrice Lampert,* assistant attorney general, with whom on the brief were *John W. Reynolds,* attorney general, and *Mortimer Levitan,* assistant attorney general.

For the appellants Ed. Steigerwald & Sons and Employers Mutual Liability Insurance Company there was a brief by *Wickham, Borgelt, Skogstad & Powell,* attorneys, and *E. H. Borgelt* and *Anton Motz* of counsel, all of Milwaukee, and oral argument by *Mr. Motz.*

For the respondent there was a brief and oral argument by *Bernard C. Westfahl* of Milwaukee.

DIETERICH, J. The only issue in this case is whether the employee sustained an accidental injury and if such accidental injury arose out of his employment.

Cleon P. Brown, a bricklayer, was thirty-three years of age on the date of the alleged accident. He weighed 170 pounds and was six feet, three inches tall. He had been a bricklayer about six years.

On the morning of September 16, 1957, Brown was laying bricks for a double wall. His testimony follows:

"*Q.* . . . Will you explain to the examiner what work you were doing on that date? *A.* We were working on a double brick wall. The scaffold previously was inside and outside, and on this particular day they discontinued the outside scaffold and work was carried on from the scaffold on the inside.

"*Q.* By working on the inside, you mean you were setting the score brick on the inside, is that right? *A.* Yes.

"*Q.* In what manner, could you explain to the examiner here, in what manner your actual work was being performed this date? *A.* . . . the outside brick wall had to conform with the gable of the roof, the roof-tiers form, and it was necessary to reach out over the wall, lean out over the wall from the inside scaffold to scribe these brick and line them up

to such degree that the cut would be made to conform with the gable of the roof.

"*Q*. Was this the normal way in which you had been laying brick on this job or other jobs prior to this time? *A*. No.

"*Q*. In what way was it different? *A*. We worked on the outside of the wall when the outside wall was being put up and when the inside wall was run up, we reverted to the inside scaffold.

"*Q*. . . . there were two walls being erected, inner wall and outer wall? *A*. Yes.

"*Q*. And was the inner and outer wall brick? *A*. Yes.

"*Q*. Now, when you were working on the inside, on the date you claim you had an injury, were you laying just the inner wall or were you also laying the outer wall? *A*. Laying both walls.

"*Q*. How did you lay—which did you lay first? *A*. It is usually customary to lay the outer wall first.

"*Q*. On this job you were doing that day, what were you laying first, the inner wall or outer wall? *A*. The outer wall.

"*Q*. In other words, you were putting score brick on the outside and score brick on the inside? *A*. You usually put up five course which is header high. Then it is necessary to bring up the inside wall to conform with the outside wall, and tie the two together with header brick.

"*Q*. The type of work you were doing on September 16, 1957, was that in any way more difficult than the normal way you laid brick before? *A*. Much more, I think.

"*Q*. Why? *A*. Too much of a strain to reach out over this particular wall and mark the brick accordingly and to line them up and you had the outside wall and inside wall, both had to be laid with a degree of accuracy. It wasn't work that wouldn't be seen, it had to be—

"*Q*. I don't understand why you have to reach over, by your testimony here you told me the outside wall was put up first and then the inside wall. If you put up the outside first, it wouldn't seem you would have to reach up any wall to put anything up? *A*. They both go up together at the same time, five courses at a time.

"*Q.* How high do you work on a wall like that, what height on your body does that wall get before a scaffolding is raised? *A.* Usually five foot, we were using five lengths on this job.

"*Q.* Why did you choose this manner of proceeding? *A.* It was the manner that the foreman set up.

"*Q.* Now at the time of this injury which was September 16, 1957, you had been a bricklayer for how long before that time? *A.* Almost six years.

"*Q.* How many times, if any, prior to September 16, 1957, had you laid brick in the same manner as you did on this job? *A.* I think only on one occasion. . . .

"*Q.* About how heavy were the bricks that you were setting in place on September 16, 1957? *A.* Perhaps from three to five pounds.

"*Q.* You state it was necessary for you to line the outside bricks with the bricks placed below in order to get a finished wall, is that right? *A.* The joints have to follow pretty close in a vertical line, yes.

"*Q.* Well, how do you determine where to set your brick in order to line it up that way? *A.* You usually sight with your eye.

"*Q.* Explain how you sighted with the eye on this particular day? *A.* I had to lean out over the wall and look down. . . . The wall was on the inside, it was down much lower at this time because it hadn't the scaffold was just raised prior to starting on this date and it was necessary to, it was in a place where you couldn't get down on your knees to get over there to do it on the outside part and yet it was almost too much to bend over to do it. It was a very awkward position.

"*Q.* When you set a brick first you line it up, do you put a marker there to determine where your next brick is going? *A.* No.

"*Q.* When did you line it up? *A.* It started from a window beam on the outside portion. Then it worked from two windows on one, each side of the building. Then we worked to the center and the window beam was kept plumb, and the joints usually follow pretty close to conformity with the ones below but it is still necessary to check every once in a while and also at that time they had to be cut on an angle, and that

you had to—they had a line stretching from the back of the gable to the sill plate on the outside wall and it was necessary to reach out, lean out over the wall and to scribe the, set the brick dry on the wall and then to mark the brick to conform with the gable.

"*Q*. And then you would set those brick. At this time you were setting and lining it up with your eye to see if it would conform with the other brick that was set? *A*. Yes.

"*Q*. About what time of the day did you notice any discomfort on September 16, 1957? *A*. It must have been around midmorning, around 9:30 or 10.

"*Q*. What did you feel? *A*. At the time I was leaning over the wall I got a sharp pain in my back and then just like a snap of the finger it was gone. Then later on during the day I felt some discomfort running down to the hip region and penetrating down to the right leg.

"*Q*. Did you work a complete shift that day? *A*. Yes, I did.

"*Q*. And did you come back to work the next day, September 17, 1957? *A*. Yes, I did. . . . I did not work a complete day. I had too much pain in the morning, I could hardly reach over to pick up my tool bag from the floor of our work shanty and during the course of the morning I found it very difficult to bend and do the labor that I was accustomed to doing.

"*Q*. Did you have pain? *A*. Very much. In the back and my right leg.

"*Q*. Did you finish the day's work on September 17, 1957? *A*. No, I didn't.

"*Q*. About what time did you quit? *A*. I went home at noon.

"*Q*. Did you quit because of the pain you testified to? *A*. Yes.

"*Q*. Did you seek any medical advice at that time? *A*. . . . that afternoon I went to see a chiropractor.

"*Q*. . . . after September 17, 1957, when was the next day that you went to work? *A*. September 30, 1957.

"*Q*. And who did you work for? *A*. I went back to Steigerwald.

"*Q.* And did you work that full day? *A.* Yes.

"*Q.* And did you work the next day? *A.* Yes.

"*Q.* And the next day? *A.* No. . . . I couldn't get out of bed on the date of October 2d and I found it very difficult to move my body with freedom. Again I was back in the same position I was prior.

"*Q.* When you say you were back in the same position as prior, are you referring to your back bothering you again? *A.* Yes.

"*Q.* Then your last day of work you last testified to was what date? *A.* October 2d.

"*Q.* Then when was your next day of work? *A.* Sometime in the last part of March, I don't know exactly whether it was the 26th or 27th of March, 1958.

"*Q.* . . . did you seek further medical advice? *A.* Yes, I did. On October 2d I went to see my family physician, Dr. Saketos. . . . he put me in the Deaconess Hospital and kept me under observation and at a later date he called in Dr. Sadoff.

"*Q.* . . . how long were you under observation? *A.* About five or six days.

"*Q.* What treatment was prescribed in that period of time? *A.* Some form of medication, I don't know what it was, and X rays.

"*Q.* And then you say he called in Dr. Sadoff? *A.* Yes.

"*Q.* And what was his diagnosis or what was the treatment that he prescribed? *A.* He put me in traction . . . for about eight days.

"*Q.* When were you discharged from Deaconess Hospital? *A.* I was discharged on three different occasions, sometime in the last part of October . . . around the 22d.

"*Q.* Did you then go back to work? *A.* No, I was in a body cast, . . . for a week.

"*Q.* Was it necessary for you to go back to the hospital again? *A.* Yes. I went back to the hospital a week after I was discharged . . . for further diagnostic treatment.

"*Q.* And how long were you in the hospital? *A.* Three or four days.

"*Q.* And you were then discharged? *A.* Yes, but I was to come back for surgery.

"*Q.* And when did you go back to the hospital for surgery? *A.* Third of November.

"*Q.* And surgery was performed when? *A.* On the 4th of November.

"*Q.* How long were you in the hospital? *A.* Until the day before Thanksgiving.

"*Q.* Then you were discharged? *A.* Yes.

"*Q.* When you were discharged, were you able again to go back to work? *A.* No.

"*Q.* Did you wear a cast? *A.* Yes, I did . . . until the first of March.

"*Q.* When was the first time after the first of March that you were able to go back to work? *A.* I went back to work the last part of March.

"*Q.* Did any other doctor besides Dr. Saketos and Dr. Sadoff treat you? *A.* Yes. Dr. Levin.

"*Q.* And when did Dr. Levin treat you? *A.* On my second admission to the hospital on the 3d.

"*Q.* Was he called in by Dr. Sadoff? *A.* Yes, he was.

"*Q.* And he was called in to aid on the surgery which was performed, is that right? *A.* Yes.

"*Q.* Mr. Brown, prior to September 16, 1957, did you ever in any way to your knowledge injure your back? *A.* Not that I know.

"*Q.* Were you ever treated for any ailment of the back prior to said date? *A.* No."

Dr. Jules Levin, on behalf of the employee, testified as follows:

"*Q.* Doctor, you treated the applicant, Cleon Brown, in regard to the injury he testified to? *A.* I did.

"*Q.* Would you tell the examiner here what you did in regard to treatment of Mr. Brown and what condition you found to exist? *A.* I first saw Mr. Brown October 28, 1957, at Deaconess Hospital at the request of Dr. Sadoff. The history was as given. He stated that the type of work he was doing that day, laying the outer wall of double brick from the inside was unusual; that he had done this only perhaps two other times in the entire length of his masonry career. The neurological examination revealed the following pertinent findings: He stood with a list to the left; he walked

with a limp favoring the right leg; there was a flattening of the lumbar curve and marked tenderness at the right fourth and fifth lumbar spaces. There was Grade II muscle spasm in the lumbar area. Forward bending was limited to 15 degrees with precipitating pain into the right leg. Straight leg raising was done to 15 degrees on the right; 50 degrees on the left. The latter precipitated right leg pain. The right ankle reflex was absent. My conclusion was that he had a low back syndrome with discogenic disease at the right fourth or fifth lumbar space. On my initial examination in view of the failure of conservative therapy, myelography was recommended. This was carried out October 28, 1957, and revealed a defect at the right lumbosacral space. Because conservative therapy was to no avail, surgery was recommended and this was done November 4, 1957, at which time a herniated disc was removed from the lumbosacral space on the right. I performed the disc surgery. Dr. Sadoff continued and did a fusion. I last saw the patient on March 7, 1958, at which time he had progressed well following his surgery. He had minimal and only occasional aching in the back. He had no leg pain. He had occasional cramps in the right calf. The neurological examination revealed that he stood erect. He was able to bend forward some 30 degrees; had some stiffness in his back, but no pain. Straight leg raising was done to 45 degrees bilaterally without any discomfort except for a mild drawing feeling in the back. He walked without a limp. There was flattening of the lumbar spine but no tenderness. There was slight perivertebral muscle spasm bilaterally. The right ankle reflex was absent. Motor power was intact.

"*Q.* Dr. Levin, you heard the testimony of Mr. Brown here this morning? *A.* I did.

"*Q.* And that testimony is substantially the same as the history the patient gave to you? *A.* It is.

"*Q.* Do you have an opinion based upon reasonable medical certainty as to whether or not there might be a causal connection between the work done by Mr. Brown on September 16, 1957, and the condition for which you treated him for and the surgery performed? *A.* I have. . . . Inasmuch as it appears from his testimony both this morning and in the delineation of the history to me that the work he did

the day of onset of backache was unusual work, was different from what he had done previously and was accustomed to do regularly, I believe it is a cause of the herniated disc."

### Cross-examination of Dr. Levin.

"Q. Doctor, what was the difference in the work that was normally done, and that Mr. Brown did on September 16th? A. As I understood the type of work that he does, the brick is usually laid on the side either—if you are laying the inside wall, you lay it on the inside. If you lay the outside wall, you work from the outside. On this occasion he was laying both layers of the wall from the one side. Of course, it was an unusual stress, a constant bending over and working on the outside wall over the layer of brick on the inside, it constituted a strain and not an ordinary bending as one would do just to bend down, but it was a reaching-over type of bending which he did at the time and which to me constitutes an unusual type of constant bending strain.

"Q. Well, then, doctor, it is the actual bending rather than any specific weights that are being lifted that caused this back trouble? A. It probably is a combination of the lifting and the bending. Ordinarily one can lift correctly when you do not have to bend over too far, the strain of lifting with your arms stretched out, bending over is unfortunately greater than that in a squatting position, . . .

"Q. Did you get a history of the weights as he explained, testified to originally this morning, the weight of these bricks, three to five pounds? A. Actually he probably mentioned it. I did not record it in my history.

"Q. As far as you were concerned, that specific weight wasn't significant? A. Only inasmuch as the repeated effort in a bent position which was different from what he had usually done."

### Redirect examination of Dr. Levin.

"Q. Doctor, as I understand it, then, the strain upon the back and particularly the portion of the back which was injured in this case would be far less if the same weight was picked up directly in front of a person and he could lift it as he would normally? A. That is correct.

"Q. That same amount of weight, even though it would be rather nominal in pounds, causes a much more-severe

strain upon the back when he is bent over and in what might be a rather awkward position? *A.* That is correct."

Dr. Harry B. Sadoff, on behalf of the employee, testified as follows:

"*Q.* Would you give the examiner your report of your examination and treatment of Mr. Brown? *A.* I saw him at Deaconess Hospital October 8, 1957, followed by a report dated October 14, 1957, addressed to the Employers Mutual Insurance Company.

"*Q.* Would you give the contents of that report for the record without reading the whole thing in its entirety? *A.* Patient was admitted to Deaconess Hospital under the care of Dr. Saketos October 2, 1957. The history of the injury is the same as he gave on the stand. The first time I saw him he gave the history of laying bricks. Later, in the hospital he said he was working as specified this morning, working on the inside wall, bending over to the outside wall. Now the positive findings are as follows: Pain in the lower back radiating to the right lower limb to the heel; coughing, sneezing, exertion aggravates the symptoms. Patient is unable to be up and about or return to employment. Examination: There is evidence of pain and discomfort and flexion deformity entire torso above the pelvis. Hips are flexed at 20-degree angle of comfort; loss of lumbar lordosis; right lumbar muscles are in spasm; rigid and prominent; palpation; tenderness and spasm of the right lumbar muscles at L4 and 5 down the right sciatic to the calf. Motion: Motion of spine upright position, painful, rigid, guarded. Entire lumbar spine moves as a unit. Extension 10 to 15 degrees, painful, pain referred to lumbosacral. All other spinal motions were painful. Walking on heels, pain in the lumbar area and posterior aspect of the right thigh. He revealed positive signs for lumbosacral lesion as noted by the various tests in the report. Had diminution of sensation about the right lower limb, posterior aspect of thigh and calf. Diagnosis at that time was lumbosacral deterioration with right sciatic early phase of discogenic disease. The treatment consisted of traction therapy, sedation, and prior to dismissal from the hospital, October 19, 1957, the patient was taken to the

operating room and a cast was applied, October 17, 1957. Patient was dismissed and then kept under observation, to report to my office on various dates. I saw him October 22, 1957. Patient was then readmitted to Deaconess October 26th, dismissed October 29, 1957, and during that interim Dr. Jules Levin saw the patient, a myelogram was performed and the patient was informed as to the findings and treatment recommended which he accepted. He was therefore admitted to Deaconess November 3d, dismissed November 27, 1957. He underwent surgery as described by Dr. Levin on November 4th. On November 25th a torso cast was applied prior to dismissal. Patient was then seen both in my office and that of Dr. Levin on various dates. I then saw the patient again on March 17, 1958. I didn't see him until May 22, 1958. I saw him last on June 20th at which time the patient has been employed as a mason. Examination reveals patient is progressing satisfactorily and is resuming activity. As to evaluation, I recommended that patient's condition be further kept under observation and evaluated at a later date.

"Q. Doctor, in your opinion, has the full recuperative period expired in respect to the surgery which was performed? A. Not yet. It takes a good year to make a fair estimate of a condition of this type.

"Q. Is Mr. Brown's testimony substantially the same as the account he gave to you? A. Yes.

"Q. Do you have an opinion based upon a reasonable medical certainty based upon the facts given to you today as to whether or not there might or could be a causal connection between the work done by Mr. Brown on September 16, 1957, and the accident and conditions which you treated him for? A. Yes.

"Q. And what is your opinion? A. On that day he did mason work of an unusual character in that he was working on the inside wall and putting up inside and outside walls. He had to bend forward to lay the brick on the outside wall requiring him excessive bending in unusual positions to lift and place the brick in proper position and line them up.

"Q. Would the position in which Mr. Brown was working, the type of work he was doing on that date this injury

occurred, would his position with laying a weight three to five pounds create a strain sufficient to cause this condition? *A.* The constant bending over from inside to the outside wall would be enough to bring on this condition."

### Cross-examination of Dr. Sadoff.

"*Q.* Doctor, is it not a fact that one can get a slipped disc just from bending over to tie a shoelace? *A.* Not the first time.

"*Q.* Well, I mean maybe tie your shoelace regularly every day and some day it is going— *A.* . . . depends how you bend over to tie your shoelace, but ordinary bending over will not bring it on.

"*Q.* Just the mere fact that the bending is being done, that doesn't necessarily cause any disc slipping, is that correct? *A.* A routine bending, no.

"*Q.* But any bending that might be different than normal routine might cause this particular slipping? *A.* An unusual maneuver bending will cause, yes.

"*Q.* And did the description of the work as Mr. Brown has described it this morning correspond with the description that you received? *A.* I said in my statement before the first time I saw him he mentioned the bricklaying and later on when I questioned him in the hospital then he mentioned about this inner wall and outer wall which I have in my records in the office. My first report which you have on file I did not go into detail as to the inner and outer wall setup.

"*Q.* Did Mr. Brown emphasize to you how often that he had done this lifting over an inner wall and outer wall? *A.* This is his second, third occasion in his career he had performed this unusual type of stress in placing the brick on the inner and outer wall."

Dr. David J. Ansfield, on behalf of defendants-appellants, testified as follows:

"*Q.* Now, doctor, based on medical probability, would you give your opinion as to the onset of this back trouble in relation to the natural work and the bending, whatever was done when he first noticed it? *A.* As I understand

this, I don't know if it is entirely clear, you want to know whether or not—what relationship the onset of symptoms that he developed on September 16, 1957, had, if any, with the work he was doing at that time?

"*Q.* That is right. *A.* Well, it is my feeling that the symptoms which he developed on that date had no relationship to the work which he was doing at that time; that the work which he was doing was not unusual; it was not hazardous; it was not excessive; and it certainly wasn't capable of producing a ruptured disc in any individual who had a normal disc. Now that a herniated disc was found only indicates that the patient had a diseased disc which eventually gave way at that particular time and which needed treatment but that work which he did could not have ruptured a normal disc. I feel that the work which he did could be considered only as normal work effort for a man of his weight, height, build and that we are experiencing here a breakdown of a diseased disc in the course of ordinary work effort. The bending seemed emphasized here a great deal. It is true he does a lot of bending at work but all bricklayers bend and all carpenters bend and all masons bend and they bend frequently but the body is so constructed that bending is a capability that everybody has and it is normal, the body should be able to bend. Ordinary bending, even in the manner in which the patient did, reaching over a wall which was about a foot and a half high to lay brick wouldn't be in any way unusual or hazardous. Certainly would not be considered excessive and consequently while his symptoms developed in the course of his work, and, by the way, he did this only for two hours when he developed the symptoms, I feel that it did not arise out of his work."

On July 10, 1958, the commission entered the following findings and order:

*"Findings.*

"That for some years prior to September 16, 1957, the applicant's occupation has been that of bricklayer; that on September 16, 1957, he was doing the usual and ordinary work as a bricklayer when he developed disability in his

back; that the applicant did not have any injury within the meaning of the compensation law of the state of Wisconsin; that he did not slip, fall, or have any accident.

"It is, therefore,

*"Ordered.*

"That the application for compensation herein be and the same is hereby dismissed."

The material facts are not in dispute which control the resolving of the legal issue of whether the herniation of the intervertebral disc was an "accident" within the meaning of the Workmen's Compensation Act.

The evidence establishes that the particular task being performed by the plaintiff as a bricklayer on September 16, 1957, was unusual to the extent that in his six years of experience there were only two days in which inside scaffolding was used to lay up both the inside and outside walls. However, the work he was doing was the usual and ordinary work of a bricklayer as found by the commission. The unanimous testimony of all three doctors is that the herniation occurred on September 16, 1957, and the commission so found.

When the facts are undisputed and only one reasonable inference is to be drawn therefrom, a question of law and not one of fact is presented. *Van Roy v. Industrial Comm.* (1958), 5 Wis. (2d) 416, 425, 92 N. W. (2d) 818, and *Mrs. Drenk's Foods v. Industrial Comm.* (1959), 8 Wis. (2d) 192, 197, 99 N. W. (2d) 172. Therefore, the purported finding of the commission, that the employee did not have an accident on September 16, 1957, is a conclusion of law which is not binding on a reviewing court.

An injury is "accidental" whether caused by a usual or unusual exertion when the result is a herniation or breakage. *Wisconsin Appleton Co. v. Industrial Comm.* (1955), 269 Wis. 312, 322, 69 N. W. (2d) 433, and *Wisconsin Power*

*& Light Co. v. Industrial Comm.* (1955), 268 Wis. 513, 517, 68 N. W. (2d) 44. In both of these cases this court quoted with approval from 1 Larson, Law of Workmen's Compensation (1952), p. 519, sec. 38.20, as follows:

"A clear majority of jurisdictions now hold that when usual exertion leads to something actually breaking, herniating, or letting go, with an obvious sudden mechanical or structural change in the body, the injury is accidental. So we find an overwhelming majority compensating for hernia, and a substantial majority compensating for cerebral hemorrhage, arterial or blood-vessel rupture, ruptured aneurysm, apoplexy, ruptured appendix, herniated intervertebral disc, stomach rupture, dislocated kidney, dislocated cervical cord, and detached retina, even when the exertion or conditions producing the change were not out of line with the ordinary duties of the job."

The fact, that the employee had a pre-existing diseased disc which was liable to herniate from even normal work effort as a bricklayer, does not relieve the employer from liability. An employer takes an employee "as is" and if he is suffering from disease predisposing to "breakage" and an exertion required by the employment causes the "breakage" at the moment of exertion, the employer is liable under the act. *Wisconsin Appleton Co. v. Industrial Comm., supra,* and *M. & M. Realty Co. v. Industrial Comm.* (1954), 267 Wis. 52, 63, 64 N. W. (2d) 413.

There is no burden upon the employee to show that the exertion being put forth at the time of the herniation was in any way unusual to his employment. In so far as the case of *Buettner v. Industrial Comm.* (1953), 264 Wis. 516, 59 N. W. (2d) 442, holds to the contrary, it is overruled. If the herniation occurs as the result of and while the employee is putting forth bending exertion in the normal course of his employment, it is obvious that the bending exertion of the employee was sufficient to herniate the diseased disc,

and it is immaterial as to whether or not he was doing anything unusual.

We concur in the trial court's determination that the commission exceeded its statutory authority when it superimposed upon the statutory requisites to compensation the requirement that the employee had to prove that his injury was the result of an exertion unusual to the ordinary work of a bricklayer.

The judgment of the circuit court setting aside the order of the commission, on the ground that the findings of fact by the commission do not support its order, and directing the commission to enter an award to the plaintiff in such an amount as it shall find proper on further proceedings, must be affirmed.

*By the Court.*—Judgment affirmed.