REICH, Plaintiff and Respondent, v. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS, Defendant and Appellant: THIELE SAUSAGE COMPANY and another, Defendants and Appellants.

*No. 122. Argued September 30, 1968.—Decided October 29, 1968.* (Also reported in 161 N. W. 2d 878.)

246

248

For the appellant Department of Industry, Labor & Human Relations the cause was argued by *Gordon Samuelsen*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

For the defendants-appellants there was a brief by *Hart, Kraege, Wightman, Bieber & Thurow* of Madison, and oral argument by *Walter D. Thurow*.

For the plaintiff-respondent there was a brief by *Habush, Gillick, Habush & Davis* of Milwaukee, and oral argument by *Lawrence D. Gillick*.

WILKIE, J. Three issues are presented on this appeal:

(1) Whether there is credible evidence to support a commission finding that the incidents of November 13 and November 19, 1964, were only "alleged" to have taken place.

(2) Assuming the incidents did take place as alleged, is there credible evidence to support a commission finding that "the alleged incidents of November 13, 1964 and November 19, 1964, were not adequate producing causes

of applicant's back condition; that the applicant's back condition was not caused by, aggravated by, or related to her employment."

(3) Whether the commission properly applied the legal standards set forth in *Brown v. Industrial Comm.*,[1] *Lewellyn v. ILHR Dept.*,[2] and other related cases.

The first two issues raised on this appeal present this court with the question of whether there is credible evidence in the record to support the commission's findings. In *Indianhead Truck Lines v. Industrial Comm.*[3] this court stated that, "If credible evidence exists in support of the commission's findings, such findings are conclusive."[4]

"The rule is that this court will affirm a finding of fact of the commission, unless such finding is clearly against all the credible testimony or so inherently unreasonable as not to be entitled to any weight."[5]

Where the evidence is sufficient to raise a legitimate doubt in the mind of the commission, as to facts necessary to establish a claim, it is the duty of the commission to deny compensation.[6]

However, as pointed out in *Richardson v. Industrial Comm.*,[7] this does not mean that any doubt is a legitimate doubt just because the commission chooses to entertain it.

[1] (1960), 9 Wis. 2d 555, 101 N. W. 2d 788.

[2] (1968), 38 Wis. 2d 43, 155 N. W. 2d 678.

[3] (1962), 17 Wis. 2d 562, 117 N. W. 2d 679.

[4] *Id.* at page 565. *See Vasquez v. ILHR Dept.* (1968), 39 Wis. 2d 10, 158 N. W. 2d 331; *Unruh v. Industrial Comm.* (1959), 8 Wis. 2d 394, 99 N. W. 2d 182.

[5] *Green Bay Warehouse Operators, Inc. v. Industrial Comm.* (1963), 19 Wis. 2d 11, 17, 119 N. W. 2d 435. *See Van Valin v. Industrial Comm.* (1962), 15 Wis. 2d 362, 112 N. W. 2d 920; *Fitz v. Industrial Comm.* (1960), 10 Wis. 2d 202, 102 N. W. 2d 93; *Tuohy v. Industrial Comm.* (1958), 5 Wis. 2d 576, 93 N. W. 2d 344.

[6] *Van Valin v. Industrial Comm., supra,* footnote 5.

[7] (1957), 1 Wis. 2d 393, 84 N. W. 2d 98.

". . . While the applicant has the burden to prove his facts to the satisfaction of the commission, the rule does not permit the commission to exercise its judgment arbitrarily and capriciously." [8]

". . . There must be in the testimony some inherent inconsistency before the commission is warranted in entertaining a legitimate doubt. It cannot rely solely upon its cultivated intuition." [9]

Is there credible evidence in the record to support a commission finding that Elsie Reich did not sustain injury to her back while employed on November 13th and 19th of 1964, *i.e.*, that these incidents were only "alleged" to have happened?

At the outset, appellant points out that the commission alone has the power and authority to weigh the evidence and to determine the credibility of the witnesses before arriving at its decision. [10]

It is the appellant's contention that the record reveals credible evidence in the form of applicant's inconsistent testimony (much of it growing out of Mrs. Reich's version of what happened as told before and at the hearing) that justifies the commission's finding on this issue. A discussion of the alleged inconsistencies follows:

### Mrs. Reich.

(a) At the hearing on June 8, 1965, Mrs. Reich testified that on November 13, 1964, she slipped while working. She stated that, "I twisted around and I tried to get hold of something, and I grabbed the wall so I did not fall down." Appellant points out that Mrs. Reich's signed

[8] *Id.* at page 396.

[9] *Id.* at page 397.

[10] *Borden Co. v. Industrial Comm.* (1958), 2 Wis. 2d 619, 87 N. W. 2d 261; *Molinaro v. Industrial Comm.* (1956), 273 Wis. 129, 76 N. W. 2d 547; *Wright v. Industrial Comm.* (1960), 10 Wis. 2d 653, 103 N. W. 2d 531.

statement to the insurance company indicated that she did not recall twisting. The statement reads, in part:

". . . I can't recall twisting or turning to either the right or left. It happened so fast, I really don't recall what happened to me. . . . I recall also grabbing for a wall . . . ."

Appellant also points out that the applicant did not mention this incident to her employer.

(b) Mrs. Reich also testified at the compensation hearing that on November 19, 1964, while carrying between 20 to 30 pounds of meat-loaf pans she had to go through a narrow space between a machine and a truck. To go through this space she had to turn sideways and carry the pans with her right arm extended at shoulder height and her left arm across her body. She testified that she could not stand the pain and had to drop the pans.

Appellant points out that this incident was never reported to the employer, the inference being that if it was not reported it never happened. In applicant's statement to the insurance adjuster she stated, "I didn't report this to anyone at work."

However, on cross-examination at the hearing applicant was asked: [11]

"*Q.* What about the fact that the statement indicates you didn't report this to anyone at work? *A.* No, I didn't report this to anybody. Just when I went home at noon I told my foreman, 'I'm going home. I think I have my back injured,' and that's all."

"*Q.* What did you mean here, Mrs. Reich, when you stated, 'I then wouldn't—couldn't stand the pain any more on November 19, 1964, and went home. I didn't report this to anyone at work. The same day I saw Dr. Klein.' Did you report it to your foreman or didn't you? *A.* I just told him, 'I'm leaving. I'm going home.' What I understand on the report, it's to go to the office and report this.

"*Q.* You told the foreman simply you were going home? *A.* I said, 'I can't work any more' and he saw it,

---

[11] Only pertinent excerpts from the cross and redirect examination are quoted.

I couldn't work any more. I told him, 'I have to go home,' and he said, 'Yes.' "

"*Q.* Now, you indicated that at the time of this incident with the pans you were carrying pans in accordion fashion, with your right arm extended, going between this machine and the hand truck and you felt pain so bad you had to drop the pans; is that correct? *A.* Yes.

"*Q.* But you didn't report this at the time; is that correct? *A.* No, I didn't."

However, on redirect examination, the applicant testified:

"*Q.* Mrs. Reich, you testified that before going home on the 19th you said something to the foreman? *A.* Yes.

"*Q.* This is important that all of us understand exactly what you said to the foreman at that time. Will you tell us this exactly as you can recall what you said to him? *A.* Well, I said, 'Hans, I have to go home because I think I hurt my back.' "

"*Q.* And you were explaining before that when you refer to reporting, you considered reporting to mean to go into the office and notify someone in the office? *A.* Yes."

The attorney general argues that when the written statement of a witness is inconsistent with his later testimony, the department may rely on the statement and reject the testimony on the theory "that the more recent the event, the fresher and more accurate the memory." [12]

Applicant persuasively argues, however, that the entire record reveals that she considered reporting to mean notification to the office, and that, therefore, her statements are not inconsistent and stand unrebutted. Furthermore, the foreman was not called as a witness—therefore applicant argues that her testimony stands as a fact. [13]

(c) Appellant points out that applicant's signed statement to the insurance adjuster did not mention the "pan incident" of November 19, 1964. Her statement reads:

[12] *Revels v. Industrial Comm.* (1967), 36 Wis. 2d 395, 401, 153 N. W. 2d 637.

[13] See *Richardson v. Industrial Comm., supra,* footnote 7, at page 397.

". . . I finished out the day [November 13] despite this. Over the weekend, I took it easy. I stayed in bed and applied heat. The symptoms in my back stayed about the same not getting any better nor worse. I went to work on 11–16–64 and worked until noon on 11–19–64. This was my last day worked."

However, on cross-examination at the hearing Mrs. Reich testified that she told the adjuster about the incident.

"Q. Do you recall whether or not you told the adjuster about this incident with the pans? A. I told him and he said, 'That's not important any more,' and he asked me if he should put it down and I said, 'I don't know.' I think we should put it down but he says it's not important any more.
"Q. Do you know that the statement contains nothing with regard to the pan incident? A. I know this because I told him and he said, 'It's not important to take it down,' and I don't know nothing about insurances so I thought what he said was O. K."

The attorney general again argues that *Revels v. Industrial Comm.*[14] entitles the commission to reject applicant's hearing testimony with regard to the "pan incident" because the earlier statement made no mention of it. However, in *Revels* the court was faced with a situation where earlier written statements *conflicted* with later hearing testimony. Arguably, however, there is no conflict here between the testimony and the statement but rather a situation where the earlier statement was not complete. It mentioned that applicant had to go home on November 19, 1964, because of pain, but it did not say what caused the pain. Furthermore, like the foreman, the insurance adjuster was not called to rebut Mrs. Reich's version of the conversation that went on between her and the adjuster.

---

[14] *Supra,* footnote 12.

(d) Appellant points out that claimant did not give a history of the November 13, and November 19, 1964, incidents when she entered the hospital. There is no evidence in the record that the hospital inquired as to the cause of pain. Mrs. Reich testified that no one asked her. The hospital records read as follows:

"40F admitted w/gradual onset of Lumbosacral pain & tenderness w/radiation to both lower extremity of one week duration. She has been carrying heavy loads in work on & off when she gradually felt some growing pains in L-sacral region w/radiation to both lower ext. She said she couldn't lift herself in bed; both legs hurt with a sort of pulling pain and that it hurts most in rt. side of the back. Pain has been not constant and it hurts her more during activity."

Therefore, while the records refer to "carrying heavy loads" at the hearing Mrs. Reich testified to the precise incidents of November 13 and November 19, 1964.

In the hospital records, the progress note on November 21, 1964, reads: "Gradual onset of back pain 10 days ago —subsided over nite—& later recurring."

(e) Dr. Bruno examined applicant in the hospital on November 22, 1964, and obtained a history from her. He was given no history of trauma at this time.

"*A.* My notes state that the patient had pain since Friday, the 13th, 1964. There was no history of trauma. She had pain from the low back to both lateral thighs. No paresthesias. Pain progressively worse until admission, and her pain was slightly relieved by bed rest."

The inference, of course, is that if the incidents were not mentioned they never happened.

(f) Mrs. Reich, in testifying at the hearing about the November 19, 1964, incident, stated that she stretched out her arms—felt pain and had to drop the pans. However,

Dr. Bruno's notes of December 3, 1964, indicate that Mrs. Reich had pain when she bent over to pick up the pans.

"As she bent over to pick up pans patient felt pain in back."

Appellant argues that these statements are conflicting. But are they? Mrs. Reich testified that her back hurt and she dropped the pans—Dr. Bruno's statement says that her back hurt when she bent over to pick up the pans from the floor.

When considered in light of the testimony of Tamara Austers (which we discuss *infra*) it appears that the above statements, when taken together, give a complete picture of the incident rather than conflicting versions of it. Is the fact that Mrs. Reich's back hurt, causing her to drop the pans, inherently inconsistent with the fact that her back hurt when she bent over to pick up the pans after they had fallen?

(g) Dr. Bruno testified that on December 3, 1964, he received a history of trauma:

"*Q*. Doctor, when you obtained the history you made an entry of that on the hospital chart; is that correct? *A*. Yes.

"*Q*. What was the history that you obtained? *A*. I would have to go over the notes on the hospital chart.

"*Q*. Are they in the hospital record, Doctor? *A*. They should be. On the 3rd of December I state that patient stated she slipped at work approximately 1 week prior to admission.

"*The Examiner:*

"*Q*. All right. On December 3, 1964? *A*. Right.

"*Q*. State in hospital record that patient states—And what does she state? *A*. She slipped at work approximately 1 week prior to admission. She rested over the weekend. Then worked to Thursday noon. On Thursday the patient drops some pans. As she bent over to pick up the pans the patient felt pain in the back. The patient had to leave at noon because of pain. The patient had been

here on a Saturday. The patient saw Dr. Klein on Thursday night, and the next paragraph—pain is less. Meaning pain on that day was less than it was previously."

The hospital record, the contents of which Dr. Bruno was testifying to, states:

"12-3-64 Pt. now states that she slipped at work approx 1 week PTA. Pt. rested over weekend then worked to Thursday noon. On Thursday Pt. dropped some pans. As she bent over to pick up pans patient felt pain in back. Pt. had to leave at noon because of pain. Admitted here on Saturday Pt. saw Dr. Klein on Thursday night, pain less."

There can be absolutely no question but what Mrs. Reich told Dr. Bruno on December 3, 1964, of both the "slipping" and the "pan incident." However, on page 14 of the brief, appellant argues that "Dr. Bruno according to his notes did not obtain a history about the slipping incident until sometime after January 8, 1965, which was the date of surgery." Appellant apparently bases this conclusion on Dr. Bruno's testimony on cross-examination.

*"The Examiner:*
"Q. You only got one history of trauma and that was the pan incident? A. Originally at that time, yes. Later on I got the other history of the slip without falling to the floor.
"Q. Was that subsequent to December 3, 1964, she related to the incident of slipping prior to the—A. (Interposing) Yes."

Obviously there is a conflict between Dr. Bruno's testimony on direct and cross-examination. However, in that the doctor was testifying as to the content of the hospital records—it seems only logical and proper to look at that record to resolve the conflict.

(h) Appellant also points out that Mrs. Reich stated in the statement to the insurance adjuster that she never had any previous back trouble of any kind. However, at

the hearing she testified that she had experienced some back trouble.

"*Q.* (By Mr. Gillick) Now, Mrs. Reich, before this incident on November 13, 1964, when you slipped, had you previously had any trouble in your back? *A.* Well, I had a little pain once in a while from—like everybody else gets a pain.

"*Q.* Had you ever required any hospital care for your back before? *A.* No.

"*Q.* Had you ever consulted a doctor about back trouble before? *A.* Yes, I was in a car accident once and I had blue spots on my back and I was treated for this.

"*Q.* Who treated you at that time? *A.* Dr. Gaenslen."

On cross-examination:

"*Q.* Do you know what type of a back injury you had at that time? *A.* Well, I was treated for black spots. I was all black and blue on the side. It wasn't exactly my back. It was more my side (indicating).

"*Q.* Are you pointing to the right side? *A.* Yes.

"*Q.* More on the right side than in the back or in the front? *A.* It was right here (indicating).

"*Q.* Right on the side itself? *A.* Yes."

It is appellant's contention that there is an inherent inconsistency between these statements. However, on this record it appears doubtful that the commission relied on Mrs. Reich's statements as support for its finding "that the applicant has had numerous episodes of back pain prior to November 13, 1964." Rather, it seems that it relied on the statement which was contained in Dr. Coles' letter to the insurance carrier to the effect that Mrs. Reich had experienced "frequent episodes of minor low back pain in the past."

*Tamara Austers.*

The court is thus presented with the question of whether the above analysis reveals inherent inconsistencies in the testimony of Elsie Reich, and if so whether

these inherent inconsistencies warrant the commission's entertainment of a "legitimate doubt" as to whether the "alleged" incidents of November 13 and 19, 1964, did in fact take place—or put another way, whether the finding of the commission (based on the above "inconsistencies") that the incidents are only "alleged" to have happened is so unreasonable that it is not entitled to any weight.

However, the above analysis, which focuses entirely upon the testimony and statements of the applicant must be considered in light of the uncontroverted eyewitness testimony of Tamara Austers.

"*Q.* And on November 19, 1964, did you see Mrs. Elsie Reich at work? *A.* Yes, I did.

"*Q.* And will you describe what you saw on that day? *A.* You mean the moment when it happened?

"*Q.* Yes. *A.* I was standing at my table with my back to the corner of the part where the pans are and suddenly I heard a dropping of pans. Automatically I turned around and I saw Mrs. Reich standing, bending over pans all over the floor, and she said to me, 'Oh, my back, my back.'

"*The Examiner:*

"*Q.* Slow down. You heard dropping of pans and turned around and saw—*A.* And I saw Mrs. Reich bending over.

"*Q.* Bending over pans scattered on the floor? *A.* Yes, and she said to me, 'Oh, my back, my back.'

"*Mr. Gillick:*

"*Q.* Who picked up the pans? *A.* I picked up the pans. I helped her straighten out. I gave her the pans in the hands and she slowly went back.

"*Q.* Went back to her regular work or wherever she went? *A.* Yes.

"*Mr. Gillick:* I guess that's all.

"Cross-examination by Mr. Richardson:

"*Q.* Now, as I understand your testimony, Mrs. Austers, you heard the pans drop; is that correct? *A.* Yes.

"*Q.* And then your first time you had seen Mrs. Reich was when she was bending over picking up the pans? *A.* Yes. She wasn't picking up the pans. The pans was on the floor and she was standing this way (demonstrating).

"*Q.* Bent over from the waist? *A.* Bent over, yes.

"*Q.* And you picked up the pans or helped her? *A.* No, I picked the pans up myself.

"*Q.* But you gave them back to her? *A.* Yes.

"*Q.* And she carried them from there? *A.* Yes.

"*Q.* How heavy were the pans? *A.* Maybe 20 pounds. Maybe more.

"*Q.* Did you report this to anybody at work? *A.* No, I didn't know that it was so serious. I laughed about it.

"*Q.* You said you didn't know it was serious, you laughed about it? *A.* In our work—you hurt yourself. I didn't know."

Appellant presents two arguments in support of the commission. *First,* it is argued that because of the inherent inconsistencies in the testimony of the applicant, the commission could properly disregard the testimony of Tamara Austers. The theory seems to be that the alleged inherent inconsistencies in applicant's testimony not only impeach the credibility of the applicant but also impeach the credibility of Tamara Austers.

In *Richardson v. Industrial Comm.*[15] this court was faced with a fact situation involving uncontroverted testimony of a witness. Commenting upon this testimony the court noted that:

"No part of Richardson's testimony was brought into doubt by that of other witnesses; his was the only testimony in the record." [16]

However, it appears that this case can be distinguished from the one presently under consideration in that arguably Tamara's testimony was brought into doubt by the alleged "inherent inconsistencies" in the testimony of the applicant who testified to the same event.

[15] *Supra,* footnote 7. *See Massachusetts Bonding & Ins. Co. v. Industrial Comm.* (1959), 8 Wis. 2d 606, 610, 99 N. W. 2d 809; *Neff v. Industrial Comm.* (1964), 24 Wis. 2d 207, 215, 216, 128 N. W. 2d 465.

[16] *Richardson v. Industrial Comm., supra,* footnote 7, at page 397.

The appellant relies on *Fitz v. Industrial Comm.*[17] as authority for the commission to disregard the eyewitness testimony. In that case the court upheld the right of the commission to rely on evidence of the attending physician that claimant's accident caused only slight injury to his right leg without subcutaneous bleeding and discoloration as against the testimony of seven witnesses, including relatives and co-workers, that claimant's legs were black, blue, green, and other colors shortly after the accident. However, in that case the commission was weighing the expert opinion of a physician against the testimony of lay witnesses. Also the court noted [18] that the testimony of the fellow employees was not consistent. In the present case it is not argued that the testimony of the applicant and the eyewitness conflict. In fact, both testify that the November 19, 1964 "pan incident" took place. Rather it is argued that inconsistencies in applicant's testimony cast doubt on the credibility of both the applicant and the eyewitness. Also, unlike the *Fitz Case*, the facts testified to are not of a medical nature.

It appears that the thrust of appellant's argument is that if there are inherent inconsistencies in applicant's testimony as to a particular fact which permit the commission to disregard the testimony of applicant as to the existence of that fact—then the commission is justified in disregarding uncontroverted eyewitness testimony of other witnesses as to the existence of that fact. But this would appear to be so only where credible evidence in the record would permit the commission to conclude that "inconsistencies" in the applicant's testimony cast doubt directly on the credibility of the eyewitness. Such credible evidence is lacking in this record. A finding by the commission that the alleged "inherent inconsistencies" in Mrs. Reich's testimony cast a "legitimate doubt" on the

[17] *Supra*, footnote 5, at pages 206, 207.
[18] *Id.* at page 207.

credibility of Tamara Austers' testimony as to what she observed on November 19, 1964, is unreasonable and not entitled to any weight. What Tamara Austers saw on November 19, 1964, was not affected by testimony and statements of the applicant after that date.

Appellant's *second* argument in support of the commission's apparent disregard of this uncontradicted testimony is that even if Tamara Austers' testimony is true with respect to what she saw, the commission was justified in concluding that the applicant was playacting. However, such a conclusion would be justified only if there were credible evidence in the record to support such a conclusion. As the trial court pointed out in its very able, painstaking analysis of the record:

"If she was capable of planning such a scheming play, she surely would have remembered it when she first talked to her doctor and to every other person she talked to."

There appears to be no basis in the record for such a conclusion by the commission.

### *Causal Relationship of Incidents of November 13 and November 19, 1964.*

Assuming then that at least the incidents did take place as alleged, is there credible evidence to support a finding that there was nevertheless no causal relationship between the incidents and the applicant's back injury?

The law is well settled that the determination of disability, its cause, its extent, or duration, present questions of fact and the industrial commission's findings thereon become conclusive if supported by credible evidence.[19]

Dr. Bruno examined Mrs. Reich on November 22, 1964. At that time his diagnosis was that she suffered from

[19] *Johnston v. Industrial Comm.* (1958), 3 Wis. 2d 173, 87 N. W. 2d 822; *Rico v. Industrial Comm.* (1960), 9 Wis. 2d 382, 101 N. W. 2d 99.

a herniated disc. With regard to later examinations, Dr. Bruno testified that:

"I performed a myelogram on the 7th of January and this revealed a protrusion at the L–5, S–1 on the right side, and on January 8 a laminectomy was performed and a protruding disc was removed in this area."

Further in the record Dr. Bruno testified as to his opinion as to the cause of Mrs. Reich's back condition:

"Q. Doctor, based on the history that you obtained and the examination that you made, do you have an opinion based on a reasonable medical probability as to the cause of the condition for which you treated her? A. Yes.

"Q. What is that opinion? A. I feel that her symptoms are explainable by the injury as cited by the patient.

"Q. By that language you state that it is your opinion that the incidents that she described caused the difficulty that you treated her for? A. Yes.

"Q. Doctor, in the history which you just read, you indicate that she advised you that on this last day of work she had dropped the pans and felt the pain picking them up. Now, assuming that prior to dropping the pans, she was carrying 30 to 35 pans, weighing 20 to 30 pounds, that she was carrying them in front of her in an accordion fashion, that she came to a narrow space through which she had to pass, and that in order to do so she had to shift these pans to the right so that her right arm was extended fully and her left arm across her body, with the pans in that fashion directly away from her body, and in moving sideways while in that position she felt a pain which caused her to drop the pans. Assuming that, that is, additional history to be added to the history that you obtained, do you have an opinion based on reasonable medical probability whether such incident was sufficient to cause the disc protrusion that you found later on myelogram and surgery? A. Yes."

The commission did not accept the opinions of Dr. Bruno.

Dr. Coles examined the applicant on December 10, 1964. A report of that examination was sent to the insurance carrier. At that time the applicant gave Dr. Coles only

the history relating to the slipping incident of November 13, 1964. She did not mention the pan incident. However, it should be noted that on December 9, 1964, the day before this examination, Mrs. Reich had given her statement to the insurance adjuster. As noted above, she testified at the hearing that the adjuster had told her that the "pan incident" was not important. That testimony stands uncontradicted. It should also be noted that at the time of Dr. Coles' examination of Mrs. Reich, she was in a highly emotional state.

In Dr. Coles' letter of opinion to the insurance carrier he stated that:

"From the foregoing, it seems likely that the patient has an acute low back derangement, of unknown etiology. I do not believe that there is intervertebral disc involvement at this time, nor do I believe that the incident on November 13, 1964, plays an etiological role in the genesis of this condition, since the patient had no immediate low back discomfort at the time, and since she has slipped in a similar fashion many times previously. *Moreover, the patient was not lifting at the time, and there was no actual fall or blow.* She has had frequent episodes of minor low back pain in the past." (Emphasis added.)

It should be emphasized that Dr. Coles' opinion was given without knowledge of the pan incident of November 19, 1964. However, when he was presented with the applicant's testimony at the hearing (which involved lifting of 20–30 pounds) he stated that the incident was not sufficient to cause a protruded or herniated disc.

Dr. Coles testified, in part, on direct examination:

"*Q.* You have been present throughout the applicant's testimony today, Doctor, have you not? *A.* Yes, I have.
"*Q.* Did you hear her describe the incident with the pans? *A.* Yes, I did.
"*Q.* Assuming the incident with the pans, with the weight that she described, do you feel that such an incident would be sufficient to cause a protruded or herniated disc? *A.* I do not.
" . . .

"*Q.* Based upon your examination of the patient and your X rays taken, and based upon the hospital record and the history also which was given by the applicant on direct and other examinations this morning, do you have an opinion to a reasonable medical probability as to whether or not the disability commencing in November, 1964, is related to her employment? *A.* Yes, I do.

"*Q.* What is your opinion, Doctor? *A.* Well, as I mentioned here in this report, I don't believe there was an adequate injury or an adequate producing cause of herniated disc.

"*The Examiner:* What was the question? Did you ask him about one specific incident or both incidents?

"*Mr. Richardson:* Both of the incidents. I asked him whether or not it was related to her employment as described in her testimony this morning and indicated in the hospital record, and also based on his examinations.

"*The Examiner:*

"*Q.* Then it is your opinion that neither incident, the pan incident or the slipping incident, was an adequate producing cause of the applicant's disc trouble? *A.* That's right."

On cross-examination Dr. Coles testified, in part:

"*Q.* Doctor, at the time you examined her on this one occasion you found no evidence of any disc involvement; right? *A.* That's right.

". . .

"*Q.* In this case you have stated that you did not feel that the incident described of carrying the pans in the fashion that she did, going through this narrow opening—you did not feel that was an adequate producing cause of a herniated disc; is that correct? *A.* For one reason she didn't mention it.

"*Q.* I am asking whether that was your opinion? *A.* That's right. Even if she had mentioned it to me.

". . .

"*Q.* That was my description, Doctor. What I am getting at is that you sat and listened to a story that she was carrying these pans extended away from her body to the side and moving sideways, and while in that position was seized with a pain that caused her to drop the pans to the floor. You state that was not an adequate producing cause. I want to know how you reason that that has no connection between her difficulty—that ac-

tivity has no connection with the pain and difficulty that she alleges she has? *A.* What was the weight of the pans?

"*Q.* Twenty to 30 pounds. *A. The main reason is because she never mentioned it to me.* [Emphasis added.]

"*Q.* Assuming that she had, you told us that you would rule it out? *A.* I don't think a lift of 20 or 30 pounds in her case would be sufficient.

"*Q.* Even in the fashion she described? *A.* No, I don't.

"*Q.* Even though while doing it she was seized with a pain that caused her to drop whatever weight she was carrying, you would rule it out? *A.* That's right.

"*Q.* Did you consider her to be disabled at the time you saw her, Doctor? *A.* I think she was disabled at that time."

Applicant argues that Dr. Coles' testimony was not credible. The primary basis for her contention in this regard is that his opinion contradicts his own standards. In his report to the insurance carrier he stated that he did not "believe that the incident on November 13, 1964, plays an etiological role in the genesis of this condition, since the patient had no immediate low back discomfort at the time, and since she has slipped in a similar fashion many times previously. Moreover, the patient was not lifting at the time, and there was no actual fall or blow." However, when the doctor was presented with the incident which involved lifting accompanied by immediate low back pain, he rejected the incident as not "sufficient to cause a protruded or herniated disc."

Assuming that Dr. Coles' testimony is credible, does his testimony support the commission finding that:

". . . the alleged incidents of November 13, 1964 and November 19, 1964 were not adequate producing causes of applicant's back condition; that the applicant's back condition was not caused by, aggravated by, or related to her employment."

This finding of the commission based on this testimony must be examined in light of the standards set forth in the cases.

*Legal Standards.*

In the landmark case of *Brown v. Industrial Comm.*[20] this court determined that:

"An injury is 'accidental' whether caused by a usual or unusual exertion when the result is a herniation or breakage." [21]

*Brown* involved a claim by a bricklayer, who suffered a herniated disc while he was doing the usual and ordinary work as a bricklayer. The commission denied compensation on the theory that because he was not doing work unusual to that of a bricklayer he had not suffered an accident within the meaning of the Workmen's Compensation Act. The court, quoting from Larson, *Law of Workmen's Compensation*,[22] reversed:

" 'A clear majority of jurisdictions now hold that when usual exertion leads to something actually breaking, herniating, or letting go, with an obvious sudden mechanical or structural change in the body, the injury is accidental. So we find an overwhelming majority compensating for hernia, and a substantial majority compensating for cerebral hemorrhage, arterial or blood-vessel rupture, ruptured aneurysm, apoplexy, ruptured appendix, herniated intervertebral disc, stomach rupture, dislocated kidney, dislocated cervical cord, and detached retina, even when the exertion or conditions producing the change were not out of line with the ordinary duties of the job.' " [23]

The court noted that:

"The fact, that the employee had a pre-existing diseased disc which was liable to herniate from even

---

[20] (1960), 9 Wis. 2d 555, 101 N. W. 2d 788.

[21] *Id.* at page 569. *See Wisconsin Appleton Co. v. Industrial Comm.* (1955), 269 Wis. 312, 322, 69 N. W. 2d 433; *Wisconsin Power & Light Co. v. Industrial Comm.* (1955), 268 Wis. 513, 517, 68 N. W. 2d 44.

[22] 1 Larson, *Law of Workmen's Compensation* (1952), p. 519, sec. 38.20.

[23] *Brown v. Industrial Comm., supra,* footnote 20, at page 570.

normal work effort as a bricklayer, does not relieve the employer from liability. An employer takes an employee 'as is' and if he is suffering from disease predisposing to 'breakage' and an exertion required by the employment causes the 'breakage' at the moment of exertion, the employer is liable under the act. . . .

"There is no burden upon the employee to show that the exertion being put forth at the time of the herniation was in any way unusual to his employment." [24]

Thus it is clear on the basis of *Brown* that there are two elements necessary for compensation: (1) There must be a "breakage" (a letting go, a structural change, etc., as described by Professor Larson), and (2) this breakage must have occurred on the job while the employee was exerting either usual or unusual effort.

These elements were very recently reaffirmed in *Lewellyn v. ILHR Dept.*,[25] and today in our decision in *Detter v. ILHR Dept.*[26]

We do not think that the commission made an adequate finding on whether a breakage occurred, and, if so, whether it occurred on the job while Mrs. Reich was exerting usual or unusual effort.

One further reason for determining that the commission's findings are inadequate and remanding the cause for further consideration there is that there is no credible evidence in the record to support the further commission finding "that the applicant's back condition was not caused by, aggravated by, or related to her employment."

In the *Lewellyn Case* [27] we outlined three different particular factual situations that would determine whether or not recovery would be had (all of which involved a preexisting degenerative condition) :

[24] *Id. See Wisconsin Appleton Co. v. Industrial Comm., supra,* footnote 21; *M. & M. Realty Co. v. Industrial Comm.* (1954), 267 Wis. 52, 63, 64 N. W. 2d 413.

[25] *Supra,* footnote 2.

[26] Post, p. 284, 161 N. W. 2d 873.

[27] *Supra,* footnote 2.

"(1) If there is a definite 'breakage' (a letting go, a structural change etc., as described by Professor Larson), while the employee is engaged in usual or normal activity on the job, and there is a relationship between the breakage and the effort exerted or motion involved, the injury is compensable regardless of whether or not the employee's condition was preexisting and regardless of whether or not there is evidence of prior trouble. *Brown v. Industrial Comm., supra,* and *Indianhead Truck Lines v. Industrial Comm., supra.*

"(2) If the employee is engaged in normal exertive activity but there is no definite 'breakage' or demonstrable physical change occurring at that time but only a manifestation of a definitely preexisting condition of a progressively deteriorating nature, recovery should be denied even if the manifestation or symptomization of the condition became apparent during normal employment activity. *Shawley v. Industrial Comm., supra; Van Valin v. Industrial Comm., supra;* and Currie, 37 Wis. Bar Bulletin 7.

"(3) If the work activity precipitates, aggravates and accelerates beyond normal progression, a progressively deteriorating or degenerative condition, it is an accident causing injury or disease and the employee should recover even if there is no definite 'breakage.' *Shawley v. Industrial Comm., supra;* Currie, 37 Wis. Bar Bulletin 7." [28]

Under (3) above it is clear that if a preexisting condition is aggravated and accelerated beyond normal progression by employment related activity the employee should recover even if there is no definite "breakage."

On the record in the instant case there is evidence, primarily from Dr. Coles' report to the insurance company, that the applicant had experienced "frequent episodes of minor low back pain in the past." However, there seems to be no testimony that these occurred from a "progressively deteriorating or degenerative condition"

[28] *Id.* at pages 58, 59.

within meaning of (3) above. On remand to the commission for further proceedings, it seems reasonable that in addition to the matter of "breakage," the commission should also consider the application of (3) above.

*By the Court.*—Judgment affirmed and cause remanded for further proceedings not inconsistent with this opinion.